[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUGUST 23, 2001
THOMAS K. KAHN
CLERK

No. 00-15541

D. C. Docket No. 95-00304-CV-ASG

ROBERTO ESCOBIO,
CLAUDIO SALAZAR,
CHRISTOPHER SWEENEY,

Plaintiffs-Appellants,

versus

AMERICAN INTERNATIONAL GROUP, INC.,
a Delaware corporation,
SMITH BARNEY, INC.,

Defendants-Appellees.

Appeal from the United States District Court
for the Southern District of Florida

**(August 23, 2001)**

Before EDMONDSON, DUBINA and POLITZ*, Circuit Judges.

DUBINA, Circuit Judge:

_____
*Honorable Henry A. Politz, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

This case involves an appeal from the district court's grant of summary judgment in favor of the Defendant American International Group, Inc. ("AIG") on the Plaintiffs' claim that a brokerage contract is not illegal under Chilean law. We affirm.

## I. FACTS AND PROCEDURAL HISTORY

Plaintiffs Roberto Escobio, Claudio Salazar and Christopher Sweeney ("Plaintiffs") were employed individually by Smith Barney, Inc. ("Smith Barney") as "registered representatives" in Miami, Florida. During their employment, they formed a partnership to develop insurance business in Chile and Argentina. Thereafter, they entered into an agreement with Smith Barney whereby the partnership was entitled to 50% of Smith Barney's commissions that the Plaintiffs generated.

In late 1992, Plaintiffs, as employees of Smith Barney, began negotiations in Chile with high ranking officials of the National Police Force of Chile ("the Carabineros") regarding the possibility of providing asset management services and certain insurance to them. Subsequently, the Carabineros agreed to purchase group credit life and group life insurance from an insurance company designated by Smith Barney. Smith Barney introduced the Carabineros to La Interamericana Compania de Vida S.A. ("Vida"), a Chilean affiliate of AIG, for the purpose of

writing the contracts. AIG is a New York corporation, and Vida, a Chilean corporation, is its foreign subsidiary. Following the issuance of the policies, Vida paid 10% of the premiums collected into escrow pending Smith Barney's registration in Chile. Plaintiffs claim to be third party beneficiaries to the agreement thus entitling the Plaintiffs to part of the commissions.

Plaintiffs sent Smith Barney the appropriate forms to register as an insurance broker in Chile. Plaintiffs asked Smith Barney to expedite the registration so that Smith Barney and the Plaintiffs could receive commissions. Smith Barney did not register. Escobio testified that he knew he could not receive any commission with regard to the brokerage insurance or placing of insurance business in Chile until Smith Barney was licensed under Chilean law. Escobio concluded, however, that he was acting as a financial advisor and consultant, rather than a broker.

AIG reached an oral agreement with Smith Barney to pay 10% of the gross premiums earned on the insurance policies to be issued by Vida. The purpose of the agreement was for Smith Barney to serve as the broker. On December 7, 1993, AIG, through Vida, issued a letter to Smith Barney stating that AIG had issued the policies and that Smith Barney could receive its 10% commission when it became a registered broker in Chile.

Both parties agree that under Chilean law, any person who engages in the marketing or sale of insurance of a company as a sales agent must be registered in the special Registration Ledger kept by the Superintendencia de Valores y Seguros ("Superintendencia"). To legitimize its situation in Chile, Smith Barney needed to be licensed as an insurance broker with the Superintendencia and designated by the policyholder as its insurance broker.

In the months prior to and following the issuance and effective date of the policies, Smith Barney failed to register as an insurance broker in Chile. Smith Barney - not the individual Plaintiffs - was registered when it entered the contract with AIG and when the Plaintiffs solicited the Carabineros to procure insurance.

By letter dated March 9, 1994, the Carabineros notified Vida that Smith Barney had not met the legal requirements to be a broker in Chile, and in lieu of Smith Barney, they had designated the duly registered Chilean brokerage firm of Ossa, Covarrubias & Cia, Ltda. ("Ossa") as their insurance broker, effective retroactive to January 1, 1994.

On March 17, 1994, Smith Barney formed a brokerage entity in Chile, but did not obtain authorization to engage in brokerage activities until May 5, 1994. After the formation of Smith Barney Chile, Vida wrote a letter to the Carabineros pointing out that it was paying commissions to Ossa pursuant to the Carabineros's

4

instructions and advising that it was ready to pay the commissions to whichever broker the Carabineros selected. The Carabineros instructed Vida to pay Ossa all of the commissions associated with the issued policies.

Plaintiffs filed suit and AIG moved for summary judgment. The district court initially denied AIG's motion, determining that genuine issues of material fact remained that precluded summary judgment on Plaintiffs' third party beneficiary claim against AIG. Plaintiffs filed a second amended complaint, and AIG filed a second motion for summary judgment based on two grounds: (1) that the illegality of Plaintiffs' unlicenced brokerage activities precluded recovery of commissions and rendered the oral agreement unenforceable as a matter of law; and (2) Plaintiffs were not parties to, nor intended third party beneficiaries of, the alleged AIG/Smith Barney brokerage agreement and, therefore, lacked standing to enforce it. The district court denied summary judgment on both grounds because the court concluded that without more complete information on Chilean law that is properly authenticated, the court could not reach a definitive conclusion on a motion for summary judgment.

Following the entry of that order, both parties engaged in extensive discovery and briefing on the issue of applicable Chilean law. After both parties agreed the case was ripe for determination, the district court then determined that

5

there were no remaining material issues of fact in dispute and entered summary judgment for AIG. The Plaintiffs then perfected this appeal.

## II. ISSUES

1. Whether the district court erred by entering summary judgment in favor of AIG on the basis that the brokerage contract is illegal under the law of Chile (where the contract was to be performed) because Smith Barney and the Plaintiffs were not licensed brokers in Chile.

2. Whether the district court erred by entering summary judgment in favor of AIG on the basis that the brokerage contract was unenforceable under the law of New York (where the contract was made).

## III. STANDARDS OF REVIEW

We review *de novo* a district court's grant of summary judgment. *Killinger v. Samford Univ.*, 113 F.3d 196, 198 (11th Cir. 1997). This court also reviews *de novo* a district court's determination of foreign law. *United States v. Gecas*, 120 F.3d 1419, 1424 (11th Cir. 1997).

## IV. DISCUSSION

In its September 11, 1998, opinion granting summary judgment, the district court determined that the existence of any illegality will be determined under Chilean law, while the effect of such illegality will be determined under New York

6

law.  Where performance occurs in Chile, rather than in New York, the existence

of illegality will be determined under Chilean law, while the effect of such

illegality will be determined under New York law.  *Dornberger v. Metropolitan*

*Life Ins. Co.*, 961 F. Supp. 506, 533 (S.D.N.Y. 1997) (in cases where foreign law is

violated, the *existence* of illegality is to be determined by the local law of the

jurisdiction where the illegal act is done while the *effect* of illegality upon the

contractual relationship is to be determined by the law of the jurisdiction which is

selected under conflict analysis)(emphasis added); *Restatement (Second) of*

*Conflict of Laws* § 202 cmt. c (1971).

To determine the existence of illegality, a court must first look to the plain

language of the statute at issue.  *See Netherlands Shipmortage Corp., Ltd. v.*

*Madias*, 717 F.2d 731, 733 (2nd Cir. 1983).  The district court determined that the

plain language of the Chilean statute mandates that insurance brokers are required

to register in the Registration Ledger kept by the Superintendencia for such

purpose and to fulfill certain other enumerated requirements.  The district court

also adopted the mutually agreed upon interpretation of Chilean law as follows: (1)

the laws of Chile require a person or entity to be duly registered (licensed) with the

Superintendencia as an insurance broker before engaging in insurance brokerage

activities in Chile; (2) the purpose of the Chilean statutory requirement for

licensing of insurance brokers is to protect the public interest and maintain a certain level of professional conduct, not to raise revenue; (3) the Chilean law provides for harsh penalties for activities taken without registration; (4) in Chile, the insured, not the insurance company, selects and designates the broker of record, and the insurance company has no choice in accepting or not accepting a new insurance broker designated by the insured; and (5) in Chile, if the insured changes its broker of record, the insurance company must pay the commissions to the new broker and the old broker has no right to receive commissions thereafter. Based on these findings, the district court concluded that under Chilean law, Plaintiffs are not entitled to insurance commissions for policies solicited when, at the time of the solicitation, neither they nor Smith Barney were registered as brokers under Chilean law.

Where the issue of foreign law has not been addressed by the courts of the foreign jurisdiction, then a federal court must engage in a two-step process of determining what the courts of the forum state would predict that the courts of the foreign jurisdiction would find. *Rogers v. Grimaldi*, 875 F.2d 994, 1002 (2nd Cir. 1989). Although the procedure by which New York courts predict the content of unsettled foreign law is itself somewhat ambiguous, the Second Circuit has indicated that it believes that New York courts would, as a matter of substantive

8

interpretation, presume that the unsettled common law of another state would resemble New York's. *Id.* at 1003. The courts would, however, examine the law of the other jurisdiction and that of other states, as well as their own, in making an ultimate determination as to the likely future content of the other jurisdiction's law. *Id.* Following that procedure, the district court determined that while the Chilean statute itself does not say that non-registration results in forfeiture, the legislative purpose of the statute, coupled with the penalties associated with non-compliance, supports that conclusion. The district court then found that retroactive registration does not cure the illegality under Chilean law, particularly when the insured designates a new insurance broker prior to the occurrence of the late registration.

Having determined the existence of an illegality under Chilean law, the district court next addressed the effect of that illegality under New York law. Under New York law, it is well settled that contracts that violate statutory provisions are, as a general rule, unenforceable on public policy grounds where the statute that is violated was enacted to protect the public health and safety. *Richards Conditioning Corp. v. Olee*, 21 N.Y.2d 895, 896-97 (1968). Both Chilean law experts agreed that the registration statute was enacted for the public good and safety. The rationale for refusing to enforce such contracts, under New York law, is not based upon a desire to relieve a party from the obligation that he

has assumed, but rather is based upon the theory that such an agreement is injurious to the interests of society in general and that the only way to stop the making of such contracts is to refuse to enforce them. *See McConnell v. Commonwealth Pictures Corporation*, 7 N.Y. 2d 465, 469 (1960).

Contracts which violate a statute may be enforced, however, if the statute does not provide expressly that its violation will deprive the parties of their right to sue on the contract and if the loss of judicial recourse would be out of proportion to the requirements of public policy or appropriate individual punishment. *Lloyd Capital Corp. v. Henchar, Inc.*, 80 N.Y.2d 124, 127 (1992). Courts are also more amenable to enforcing such contracts where the party who is alleged to have breached the contract is attempting to use improperly public policy. *See id.* at 127.

The district court found that whether a particular contract is unenforceable on illegality grounds depends on the nature of the statutory provision that is violated by the contract and the legislative purpose for which it was enacted. The court noted that it should examine the particular regulatory scheme involved and decide how to further the purposes of the statute and balance that with what is fair. *See Todisco v. Econopouly*, 155 A.D.2d 441, 447 (1987). Here, the Chilean statute, like its New York counterparts, was enacted to protect the public against fraud and not merely to raise revenue. As such, the absence of a specific forfeiture

provision in the Chilean statute is not a determinative feature under applicable New York law. *See Benjamin v. Koeppel*, 650 N.E.2d 829, 830-31 (1995) (noting that the key to determining the applicability of the *malum prohibitum* exception to the unenforceability of illegal contracts is whether the purpose of the licensing statute is to raise revenue or the prevention of fraud). Under New York law, the absence of a voiding provision does not *ipso facto* save a contract executed in violation of law from being deemed unenforceable. *Alsaedi v. Alsaedi*, 676 N.Y.S.2d 778, 781 (1998).

Pursuant to New York law, a person or entity who did not have a required insurance license at the time he/it engaged in brokerage activities cannot, as a matter of law, recover compensation associated with unlicenced brokerage activities. *See Gutfreund v. DeMian*, 227 A.D.2d 234 (1996); *McEvoy v. American Lumbermen's Mutual Casualty Co. of Illinois*, 51 N.Y.S.2d 306 (1944). The district court noted that New York courts would view their own law as to the effect of illegality under Chilean law and, given the purposes of Chilean law, would declare the oral contract at issue to be void for lack of a broker's license at the time of the solicitation or making of the insurance contract for commission.

In conclusion, we agree with the district court's finding that New York law governs the nature, validity and interpretation of the contract. Moreover, we agree

11

that the district court properly noted that New York law prescribes that the *existence* of any illegality would be determined under Chilean law, while the *effect* of such illegality would be determined under New York law. Interpreting Chilean law, the district court correctly determined that the illegality of Plaintiffs' unlicenced brokerage activities precluded recovery of commissions and rendered the oral brokerage agreement unenforceable as a matter of law.

Accordingly, we affirm the district court's grant of summary judgment to AIG.

**AFFIRMED.**