[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 06-12158
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 28, 2008
THOMAS K. KAHN
CLERK

D. C. Docket No. 05-20470-CV-UUB

BELIZE TELECOM LTD,
INNOVATIVE COMMUNICATIONS COMPANY, LLC,

Plaintiffs-Appellants,

versus

GOVERNMENT OF BELIZE, THE,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(May 28, 2008)**

Before ANDERSON and PRYOR, Circuit Judges, and ALBRITTON,* District
Judge.

_____
*Honorable W. Harold Albritton, United States District Judge for the Middle District of
Alabama, sitting by designation.

ANDERSON, Circuit Judge:

Innovative Communications Company ("ICC") and Belize Telecom ("BT") appeal from a district court judgment holding that the Government of Belize did not breach the parties' agreements or the Belize Telecommunications Limited ("BTL") Articles of Association when it removed six directors from the BTL board and appointed new directors in their place. Appellants also appeal the district court decision to vacate a contempt order entered against the Government of Belize prior to the district court's final adjudication of the case.

The primary issue in the parties' dispute is the proper interpretation of two of the BTL Articles that govern the appointment and removal of BTL directors. Prior to final judgment in the district court, the Belize Court of Appeals, in parallel proceedings, ruled on the interpretation of one of these articles, Article 90(D)(ii). The district court's judgment is, in part, contrary to the Belize court's interpretation. Therefore, in reviewing the district court's interpretation of the BTL Articles of Association, this Court must consider whether the district court should have deferred to the Belizean judgment in regard to Article 90(D)(ii). For the reasons explained below, we affirm the district court's judgment in part, reverse in part, and remand for further proceedings.

I. FACTS

2

The dispute in this case arises from a sale of stock in Belize Telecommunications Limited and the subsequent removal and election of directors to the BTL Board. BTL is a Belizean limited liability company and the primary provider of telecommunications in Belize. In the fall of 2003, the Government of Belize ("Government") entered into negotiations with Innovative Communications Company for the sale of BTL shares. Under the anticipated agreement, ICC would gain a super-majority ownership interest in BTL. ICC negotiated a memorandum of understanding and share purchase agreement with the Government, but created a subsidiary in Belize, Belize Telecom, to close the share purchase agreement and take ownership of the shares.

The BTL Articles of Association provide for an eight-member board. There are three classes of shares: the special share, "B" shares, and "C" shares. Two directors are appointed and removed by the holder of the special share. A majority of B shareholders can appoint and remove another two directors, known as B directors. Pursuant to Article 90(D)(i), a majority of C shareholders "apart from the holder of the Special Share or any Associate of such holder" can appoint the remaining four directors, known as C directors. However, under Article 90(D)(ii), the special shareholder can appoint and remove two of the four C directors "so long as it [the special shareholder] is the holder of 'C' ordinary shares amounting to

3

37.5% or more of the issued share capital of the Company." Under Article 90(E), C directors appointed pursuant to Article 90(D)(i) can be removed by a majority of C shareholders. Article 90(E) provides: "Each 'C' Director shall hold office subject only to Article 112 of Table A as extended hereunder, but (except as regards any Director appointed pursuant to paragraph D(ii) above) may at any time be removed from office by the holders of a majority of the 'C' ordinary shares." Thus, the C directors appointed under Art. 90(D)(ii) are removable by the special shareholder and are specifically exempted from the Article 90(E) removal provision.[1]

Pursuant to the parties' agreement, ICC and BT (collectively "appellants") obtained 8,000,000 class B shares, 23,294,114 class C shares, and the special share. Appellants thus owned 100% of the B shares and approximately 79% of the C shares. In accordance with these super-majority shareholdings, on April 14, 2004,

---

[1] Article 90(D)(i) states that "[t]he holders of a majority of the 'C' Ordinary shares apart from the holder of the Special Share or any Associate of such holder for the time being issued may from time to time appoint any person to be a Director." However, Article 90(D)(i) limits the number of these "C" directors to four, and Article 90(D)(ii) provides for the appointment and removal of two of these four under certain circumstances.

Article 90(D)(ii) states that "[t]he holder of the Special Share shall so long as it is the holder of C Ordinary shares amounting to 37.5% or more of the issued share capital of the Company be entitled . . . to appoint two of the Directors designated C Directors and by like notice to remove."

Article 90(E) states that "[e]ach 'C' Director shall hold office subject only to Article 112 of Table A as extended hereunder, but (except as regards any Director appointed pursuant to paragraph D(ii) above) may at any time be removed from office by the holders of a majority of the 'C' ordinary shares."

4

appellants appointed three new C directors, two new B directors, and two special share directors.

After appellants were unable to obtain financing to complete their payment for the BTL shares, the parties entered into a new set of agreements. These agreements—the payment agreement, the forbearance agreement, and the share pledge agreement—obligated appellants to make payments to the International Bank of Miami ("Bank") on unrelated debts owed to the Bank by the Government. In exchange for making these payments, the Government would extend the deadline for appellants' debt and give a dollar-for-dollar credit against the amount owed for the payments made to the Bank. In addition, appellants pledged part of their BTL shares as security for the agreement. If appellants defaulted on a payment, the Government could cure the default and receive the shares pledged as security in return. Appellants retained their voting rights in the BTL shares as long as there was no default.

Appellants made the scheduled debt payments from May to September 2004. However, appellants failed to make the November 22, 2004 payment. The Government stepped in to cure the default, resulting in an assignment of the pledged shares to the Government on November 24, 2004. Appellants appointed an entirely new board of directors on November 23, 2004. On December 10, 2004,

the Government granted appellants a seventy-five day extension to make the missed payment, giving them until February 7, 2005. Unable to obtain financing, appellants failed to make the payment on February 7, 2005. Two days later, the Government seized the pledged BTL shares, removed all four C directors who had been appointed by appellants and appointed four new C directors.[2] At that time, appellants owned the special share, a minority of B shares, and approximately 38% of the C shares, amounting to approximately 30% of the issued share capital.[3] The Government owned the majority of B shares and approximately 41% of the C shares. The remaining C shares were owned by minority shareholders.

In response to the Government's appointments, appellants filed suit in the District Court for the Southern District of Florida, pursuant to the non-exclusive forum selection clause in the parties' payment and share pledge agreements. The district court granted a preliminary injunction on March 11, 2005, reinstating appellants' four C directors to office and requiring that any further removal and

---

[2] At the same time, the Government removed the two B directors who had been appointed by appellants and appointed two new B directors. The Government's appointment of these two B directors is not at issue in this appeal.

[3] Significantly, as will be clear from the discussion below, prior to the Government's seizure of the pledged shares in February 2005, appellants owned both the special share and C shares amounting to more than 37.5% of the total issued share capital. At the time of the Government's appointment of four new C directors, appellants owned C shares amounting to less than 37.5% of the issued share capital.

appointment of C directors be conducted in accordance with the BTL articles. On

March 21, 2005, the Government and minority C shareholders, who together held a

majority of the C shares, voted to replace the C directors appointed by appellants.

Appellants initiated contempt proceedings against the Government, resulting in a

contempt order entered against the Government after an evidentiary hearing. The

contempt order provided for attorneys' fees and a per diem fine of $50,000 that

would accrue until the Government complied with the preliminary injunction.

After a bench trial in June 2005, the district court held for the Government, finding

that the Government had breached neither the share pledge agreement nor the

Florida Uniform Commercial Code. The court also vacated the preliminary

injunction and contempt order.

After the issuance of the preliminary injunction, the Government filed an

action in Belize for a declaratory judgment on the proper interpretation of the BTL

Articles of Association. On April 6, 2005, Chief Justice Abdulai Conteh of the

Belize Supreme Court[4] heard the case. Both parties participated in the proceedings.

Justice Conteh issued a ruling on the interpretation of Article 90(D)(ii) that was

---

[4] The Belize Court of Appeals has appellate jurisdiction over Supreme Court decisions. Belize Constitution, Part VII 100(1) (1981). The forum selection clause in the payment and share pledge agreements designating the Southern District of Florida was non-exclusive; thus, it did not preclude venue in Belize. Neither party challenges the propriety of pursuing the declaratory judgment action in Belize.

favorable to the Government's position. The Government urged the district court to recognize the ruling at trial. Holding that it was not obligated to defer to the Belizean decision, the district court considered the opinion along with the other evidence presented at trial. After an appeal to the Belize Court of Appeals resulted in a reversal of the Supreme Court decision, appellants filed a motion for reconsideration with the district court. The district court upheld its earlier decision not to defer to the Belizean court decisions and declined to change its ruling. In the initial briefs, neither party challenged the district court's refusal to defer. However, because this case involves deference to a foreign court and therefore raises international comity concerns, we sought supplemental briefing. We consider the propriety of these rulings below and find that the district court should have abstained from ruling on Article 90(D)(ii).

## II. STANDARDS OF REVIEW

This Court reviews a district court's conclusions of law and foreign law <u>de novo</u>. <u>MiTek Holdings v. Arce Eng'g Co., Inc.</u>, 89 F.3d 1548, 1554 (11th Cir. 1996); <u>Escobio v. Am. Int'l Group, Inc.</u>, 262 F.3d 1207, 1211 (11th Cir. 2001). The district court's findings of fact are reviewed for clear error. Fed. R. Civ. P. 52(a)(6). We review a district court's imposition of contempt sanctions for abuse of discretion. <u>United States v. Pennington</u> (<u>In re Newton</u>),718 F.2d 1015, 1022

8

(11th Cir. 1983). This Court also reviews a district court's grant or denial of comity to a foreign judgment for abuse of discretion. Daewoo Motor Am., Inc. v. Gen. Motors Corp., 459 F.3d 1249, 1256 (11th Cir. 2006). A district court abuses its discretion when the court fails to apply the proper legal standard or to follow proper procedures in making its determination. Ass'n of Disabled Americans v. Neptune Designs, Inc., 469 F.3d 1357, 1359 (11th Cir. 2006).

## III. DISCUSSION

Appellants argue that the district court erred in holding that the Government did not breach the share pledge agreement and abused its discretion in vacating the preliminary injunction and the contempt order. Specifically, appellants challenge the district court's interpretation of Article 90(D)(ii) of the BTL Articles of Association and the district court's decision to rule on the interpretation of Article 90(D)(i). Appellants also argue that the district court abused its discretion in vacating the portion of the contempt order that awarded attorneys' fees and costs to appellants. Appellants asked for a permanent injunction in their initial brief, but after learning that the Government had sold the remainder of its BTL shares, appellants filed a reply brief conceding that injunctive relief was inappropriate and

9

requesting damages instead.[5]  We consider each of appellants' contentions below.

A.       Interpretation of BTL Articles of Association

Appellants argue that the Government's appointment of four C directors in February 2005 violated the share pledge agreement and the BTL Articles of Association.  Appellants contend that they are entitled to damages for their wrongful loss of control of the board as a result of the Government's appointments.  The parties do not dispute that at the time in question the Government owned a majority of the B shares, entitling it to the two B directorships, and that appellants owned the special share, entitling them to the two special share directorships.  Thus, the only directorships contested before this Court are the C directors appointed pursuant to Articles 90(D)(i) and 90(D)(ii).

1.       Article 90(D)(i) directors

Appellants assert that the interpretation of Article 90(D)(i) was not properly before the district court, and the court therefore ruled on a non-justiciable question when it interpreted Article 90(D)(i).  We find this argument to be entirely without merit.  Courts may consider issues "antecedent to . . . and ultimately dispositive of" the case before them.  U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., 508

[5] The Government is unclear about exactly when the shares were sold.  Part of the shares were sold in March 2005, and the rest "[s]ubsequent to June, 2005."

U.S. 439, 447, 113 S. Ct. 2173, 2178 (1993) (quoting Arcadia v. Ohio Power Co., 498 U.S. 73, 77, 111 S. Ct. 415, 418 (1990)). The propriety of appellants' appointment of the Article 90(D)(i) directors was relevant to whether the Government had improperly replaced those directors in February 2005. The interpretation of Article 90(D)(i) was therefore antecedent to and dispositive of part of the case before the district court, and the court did not err in ruling on it. Because appellants do not challenge the merits of the district court's ruling, we affirm the district court's interpretation of Article 90(D)(i).[6]

## 2. Article 90(D)(ii) directors

Our affirmance of the district court's interpretation of Article 90(D)(i) means that the Government is entitled to the two C directors appointed pursuant to that

---

[6] Article 90(D)(i) states that "the holders of a majority of the 'C' Ordinary shares apart from the holder of the Special Share or any Associate of such holder for the time being issued may from time to time appoint any person to be a Director." The district court held that the "apart from the holder of the Special Share" language meant that the majority C shareholder is determined after excluding from the calculation any C shares held by the special shareholder. Therefore, under the district court's interpretation, the special shareholder cannot be the majority C shareholder for the purposes of appointing directors under Article 90(D)(i). As a result, appellants did not have the right to appoint two C directors under Article 90(D)(i) in either April 2004 or November 2004. Because appellants' two directors were not appointed in accordance with the Articles of Association, those two slots were, in effect, unoccupied. Accordingly, the district court held that the Government, which in February 2005 owned a majority of C shares exclusive of appellants' C shareholdings, could appoint two C directors pursuant to Article 90(D)(i). As noted above, appellants have not challenged the merits of this ruling on appeal. We therefore affirm the district court judgment holding that appellants were never entitled to the two C directorships under Article 90(D)(i).

We note that our decision with regard to these two C directors appointed pursuant to Article 90(D)(i) is not inconsistent with the decision and result in the Belize courts.

article. This leaves only the two C directors appointed pursuant to Article 90(D)(ii). The proper interpretation of Article 90(D)(ii) was resolved by litigation in Belize. The trial court—the Belize Supreme Court—issued a decision on the interpretation of Article 90(D)(ii), which was later reversed by the Belize Court of Appeals. This resolution of the status of the two Article 90(D)(ii) C directors is described below. Because the Belize court resolved the status of these C directors in favor of appellants, as opposed to the district court's contrary resolution in favor of the Government, we must decide whether to defer to the Belize court.

The district court refused to recognize either Belizean decision, and the parties in their initial briefs did not contest the district court's decision not to defer. Because this Court was concerned about the international comity implications of any decision we issued, we asked the parties to submit supplemental briefing on what deference we should give to the Belize Court of Appeals decision, pursuant to the principles of international comity.[7] After reviewing the parties' briefs, we

---

[7] Appellate courts generally do not entertain issues or claims not raised on appeal. See Weaver v. Fla. Power & Light Co., 172 F.3d 771, 773 n.6 (11th Cir. 1999). However, it is within the court's discretion to do so. See Singleton v. Wulff, 428 U.S. 106, 120-21, 96 S. Ct. 2868, 2877 (1976) ("The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases."); see also Thomas v. Crosby, 371 F.3d 782, 793 (11th Cir. 2004) (Tjoflat, J., concurring) ("It is beyond dispute that, in general, we have the power to consider issues that a party fails to raise on appeal, even though the petitioner does not have the right to demand such consideration."). Because the existence of a foreign judgment and the potential for conflicting judgments implicate concerns beyond those of the parties to this dispute, we choose to exercise

12

conclude that international comity principles indicate that deference to the Belizean decision is appropriate.[8]

In general, federal courts have an obligation to exercise the jurisdiction conferred upon them. Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817, 96 S. Ct. 1236, 1246 (1976). However, as this Court stated in Turner Entertainment Co. v. Degeto Film GmbH, 25 F.3d 1512, 1518 (11th Cir. 1994), abstention from the exercise of jurisdiction is appropriate in some private international disputes. We note that the posture of the instant case is very similar to Turner, and we find its analysis helpful in reaching the correct result here.[9] In

our discretion in this case to consider whether comity should be extended to the Belizean judgment. See Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 408, 84 S. Ct. 923, 930 (1964) (considering sua sponte whether the Cuban Government should be prevented from suing in American courts because "the underlying reason is one of national policy transcending the interests of the parties to the action").

[8] To the extent that the Government argues appellants should be estopped from advocating deference to the Belizean decision, we note that, when the decision was contrary to its position, each party opposed deference to the Belizean decision below. Given this posture, we find neither party can present a credible estoppel argument.

[9] In Turner, a German licensee began broadcasting licensed works over a new, more powerful (and far-reaching) satellite. 25 F.3d at 1515. Turner believed the satellite broadcasts violated the parties' license agreement. Id. at 1516. After negotiations broke down, the German company filed a declaratory judgment action in Germany. Id. One week later, Turner filed a breach of contract suit in Georgia state court. Id. at 1517. The state case was removed to federal court and that court entered a preliminary injunction in Turner's favor. Id. After the injunction was entered, but before the appeal was heard, the German court issued a declaratory judgment in favor of the German licensee. Id. This Court had to decide whether to defer to the German decision or rule on the merits itself. Id. at 1518. While the issue before this Court was whether we should abstain from proceeding in the case, we noted that the posture of the case was similar to an action to enforce a foreign judgment. Id. at 1520 n.12. The posture of the instant case is

13

Turner, this Court considered whether to stay or dismiss domestic litigation after a

German court issued a judgment on the merits in parallel proceedings. Id. We

identified three factors for determining whether abstention is appropriate: (1)

international comity; (2) fairness to litigants; and (3) efficient use of scarce judicial

resources. Id.

a.    International comity

International comity encompasses the principle of respect for the acts of

sovereign nations. Id. As the Supreme Court has explained

> [t]he comity thus extended to other nations . . . is the voluntary act of the
> nation by which it is offered, and is inadmissible when contrary to its policy,
> or prejudicial to its interests. But it contributes so largely to promote justice
> between individuals, and to produce a friendly intercourse between the
> sovereignties to which they belong, that courts of justice have continually
> acted upon it as part of the voluntary law of nations.

Bank v. Earle, 38 U.S. (13 Pet.) 519, 589 (1839). Consistent with this explanation

of the principles and limitations of international comity, this circuit identified the

primary concerns in an international comity analysis: "(1) whether the judgment

was rendered via fraud; (2) whether the judgment was rendered by a competent

court utilizing proceedings consistent with civilized jurisprudence; and (3) whether

the foreign judgment is prejudicial, in the sense of violating American public

_____

similar to Turner, in that this Court must determine whether abstention is appropriate when a
foreign court has already rendered a decision on the merits of the case.

policy because it is repugnant to fundamental principles of what is decent and just."

Turner, 25 F.3d at 1519 (internal citations omitted). We also identified the relative

strengths of the foreign and domestic interests in the litigation as relevant to a

consideration of international comity. Id. at 1521.

In this case, neither party has argued that the Belizean judgments were

rendered via fraud or that the Belizean proceedings lacked any element of civilized

jurisprudence. We see no evidence that the Belizean judicial system affords

litigants treatment that is inconsistent with American notions of due process. Our

analysis therefore turns to whether the Belizean judgment violates American public

policy.[10]

---

[10] In Turner, this Court noted that, given the posture of that case, the determination of whether to defer to the German judgment was similar to an enforcement action. 25 F.3d at 1520 n.12. In diversity cases, state law governs an action to recognize and enforce a foreign judgment. See id. Because Turner was based on diversity jurisdiction, the court considered the forum state's public policy along with federal public policy. Id. The instant case is also based on diversity jurisdiction and involves deference to a foreign judgment in a posture that is similar to an enforcement action; we therefore consider the public policy of the forum state, Florida, here.

Under Florida law, "any foreign decree should be recognized as a valid judgment, and thus be entitled to comity, [1] where the parties have been given notice and the opportunity to be heard, [2] where the foreign court had original jurisdiction and [3] where the foreign decree does not offend the public policy of the State of Florida." Nahar v. Nahar, 656 So. 2d 225, 229 (Fla. Dist. Ct. App. 1995). We have no trouble concluding that these three criteria are met in this case. The parties participated in the proceedings in Belize and that court had jurisdiction over the action. Under Florida law, the plain meaning of the contract's language controls interpretation of the contract. Royal Oak Landing Homeowners Ass'n v. Pelletier, 620 So. 2d 786, 788 (Fla. Dist. Ct. App. 1993). Therefore, the Belize Court of Appeals decision, which gave effect to the plain meaning of the Articles of Association, cannot be said to violate Florida public policy.

The Belize Court of Appeals ruled on the proper interpretation of Article 90(D)(ii), which reads: "[t]he holder of the Special Share shall so long as it is the holder of C Ordinary shares amounting to 37.5% or more of the issued share capital of the Company be entitled . . . to appoint two of the Directors designated C Directors and by like notice to remove." Appellants argued that under a proper interpretation of the article, only a special shareholder with the required amount of shares could remove a director appointed pursuant to the article; if the special shareholder ceased to own enough C shares, the Article 90(D)(ii) C directors could not be removed. In contrast, the Government argued that the "so long as" language meant that the Article 90(D)(ii) C directors were entitled to their positions only so long as the special shareholder owned the requisite amount of shares. If the special shareholder's C stockholdings dropped below 37.5% of the total issued stock, the Article 90(D)(ii) C directors would lose their positions. The Belize Court of Appeals agreed with appellants, finding that the plain language of Article 90(D)(ii) did not speak to the tenure of the Article 90(D)(ii) directors, but only to their appointment and removal. Construing the article consistent with its language, the court held that directors appointed under Article 90(D)(ii) remain in office until they are removed by a special shareholder with the required amount of shares.

Thus, under the Belize Court of Appeals decision, the two C directors

appointed under Article 90(D)(ii) may only be removed by a special shareholder who also owns C shares amounting to 37.5% or more of the issued share capital of the company. If the special shareholder does not have the requisite amount of shares, the two C directors appointed under Article 90(D)(ii) remain in office until the special shareholder obtains the required amount of shares or the special share passes into the hands of a shareholder who owns the requisite amount of shares. This interpretation allows for the possibility of "entrenched directors." This is so because directors appointed pursuant to Article 90(D)(ii) can only be removed by a special shareholder owning C shares amounting to 37.5% of the total issued stock. Thus, if the special shareholder sells C shares—resulting in ownership of less than the requisite amount—and retains the special share, the Article 90(D)(ii) directors cannot be removed by any shareholder. The district court considered this result to be commercially unreasonable, which informed its decision to rule that the Article 90(D)(ii) directors only stayed in office while the special shareholder owned the requisite amount of shares.

While we acknowledge the potential difficulty created by the possibility of entrenched directors, we cannot say that the Belize Court of Appeals decision violates American public policy. The Court of Appeals decision merely gives effect to the plain language of the BTL Articles of Association. Under Belize law,

which the parties agree governs this case, corporate articles of association are interpreted under contract law principles. Under federal law, the plain meaning of a contract's language governs its interpretation.[11] Textron Def. Sys. v. Widnall, 143 F.3d 1465, 1469 (Fed. Cir. 1998); Leicht v. Bateman Eichler, Hill Richards, Inc., 848 F.2d 130, 133 (9th Cir. 1988). In this case, Article 90(D)(ii) states when and how C directors can be appointed or removed pursuant to that article. Article 90(E), which discusses removal of directors generally, specifically exempts the Article 90(D)(ii) directors. While the "so long as" language in Article 90(D)(ii) is arguably ambiguous, we cannot find that the Belize Court of Appeals decision to construe that article's terms strictly violates our public policy.

The final element in our consideration of international comity is the relative strengths of the domestic and foreign interests in the litigation. In this case it is clear that the interests of Belize far outweigh the American interests. This case involves the interpretation of the articles of association of a Belizean corporation pursuant to Belize law. The consequences of the litigation affect Belizean parties, and to the extent that the litigation might have any effect on the delivery of

---

[11] When interpreting contracts under federal law, courts look to general common law on contracts. Turner, 25 F.3d at 1520 n.12; Kennewick Irrigation Dist. v. United States, 880 F.2d 1018, 1032 (9th Cir. 1989) (looking to general contract law principles when interpreting a contract under federal law).

telecommunications services, the effect would be on the citizens of Belize. None of the parties to the litigation is an American corporation; the lawsuit's connection to the United States results from the renegotiated payment arrangements involving, tangentially, the International Bank of Miami. Therefore, the Belizean interests easily outweigh the American interests in this case. Accordingly, we find that all of the international comity factors clearly favor deference to the Belizean decision.

  b.    Fairness to litigants

Three considerations are relevant to the second factor—i.e., fairness to litigants—in the international abstention analysis: "(1) the order in which the suits were filed; (2) the more convenient forum; and (3) the possibility of prejudice to parties resulting from abstention." Turner, 25 F.3d at 1521-22 (internal citations omitted). Here, appellants filed suit in the district court in February 2005 and the Government commenced the action in Belize in March 2005. Therefore, the order in which the suits were filed tilts somewhat towards the American forum. However, as the Turner court noted, the location of the first-filed suit is not dispositive of this factor. Id. at 1522.

The other two considerations favor the Belizean forum. The above discussion—indicating that the interests of Belize far outweigh any American interests—also leads to the conclusion that the Belizean forum was more

convenient than the American forum. With respect to the prejudice factor, this consideration focuses on whether the party opposing deference to the foreign forum will receive a fair and impartial trial in the foreign forum. Turner, 25 F.3d at 1522. We readily conclude that the Government received a fair and impartial trial and appeal in Belize. Indeed, we note that it was the Government that initiated the litigation in Belize.

Thus, in weighing the three considerations under the fairness factor, we conclude that in the overall they weigh in favor of deference to the Belizean decision.

c. Efficient use of judicial resources

Finally, the considerations for the third factor, efficient use of judicial resources, are: (1) the inconvenience of the federal forum; (2) avoidance of piecemeal litigation; (3) whether the actions have common parties and issues; and (4) whether the alternative forum will issue a prompt decision. Turner, 25 F.3d at 1522 (internal citations omitted). As noted above, of the two forums, Belize was the more convenient. Deference to the Belizean court will minimize the chances of piecemeal litigation and inconsistent judgments.[12] The actions do have common

---

[12] We recognize that the Government has appealed the Belize Court of Appeals decision to the Privy Council in England and that the appeal is still pending. However, in Turner, the foreign judgment to which we deferred was also on appeal. 25 F.3d at 1517. Moreover, the

parties and issues; the Government and appellants were parties to the Belizean and American suits, and the proper interpretation of Article 90(D)(ii) was at issue in both cases, although the American litigation included some additional claims as well. Finally, the Belizean court has already issued a prompt decision at the appellate level. Overall, we conclude that considerations of efficient use of judicial resources favor deference to the Belizean decision.

In sum, the international comity factor weighs heavily in favor of deference while the fairness and judicial efficiency factors also point in that direction. In deciding whether to defer to the Belize Court of Appeals decision, the district court did not apply the Turner factors. Failure to apply the correct legal standard is an abuse of discretion. Ass'n of Disabled Ams. v. Neptune Designs, Inc., 469 F.3d 1357, 1359 (11th Cir. 2006). We conclude that the district court abused its discretion in failing to apply the Turner analysis and refusing to defer to the Belizean judgment. As our discussion here makes clear, abstention in regard to the interpretation of Article 90(D)(ii) was warranted. Therefore, we hold that, as the Belize Court of Appeals determined, appellants were entitled to the two Article 90(D)(ii) C directorships. Appellants may be entitled to damages as a result of the

_____

prospect of appellate proceedings in Turner was probable, while the prospect for further appellate proceedings in this case is entirely unclear.

21

wrongful loss of these two directorships.[13]  We thus remand the case to the district court for further proceedings.  Because the briefs mentioned in passing that an appeal has been taken to the Privy Council, we leave for the district court to determine whether a hearing on damages should proceed or a stay should be granted pending the outcome of the appeal, a matter with respect to which we have received no briefing.

B.    Attorneys' Fees and Costs Related to the Contempt Order

---

[13] The Government argues that appellants have waived their damages claim by failing to raise it in their initial brief.  We reject this argument, noting that changed circumstances may allow the plaintiff to modify the type of relief requested.  See McKinley v. Kaplan, 177 F.3d 1253, 1258 (11th Cir. 1999) (allowing plaintiff to amend her complaint to include a claim for damages once the injunctive relief initially requested was unexpectedly made moot).  Here, appellants did not know of the sale of the Government's shares until after they filed their initial brief.  In their reply brief, appellants conceded that the Government's sale of its shares mooted the appellants' claim for injunctive relief.  In lieu thereof, appellants sought damages.  The Government also argues that the district court rejected the damages claim in its final judgment.  While the district court did reject other damages claims that are not on appeal here, it never reached the issue of damages for loss of the Article 90(D)(ii) C directorships because the court ruled against appellants.  We leave to the district court to determine in the first instance whether the damage claims it has already rejected affect the damages issue we now remand.

We also reject the Government's argument that it did not waive its sovereign immunity in regard to the BTL Articles of Association.  The Government concedes that it waived its immunity under the share pledge and payment agreements, but argues that the waiver does not extend to the appointment and removal of BTL directors.  We disagree.  The share pledge agreement and payment agreement each included a forum selection clause, submitting the parties to the nonexclusive jurisdiction of the U.S. District Court for the Southern District of Florida "for the purpose of any suit, action or other proceedings arising out of this Agreement, or the subject matter hereof, or any transactions contemplated hereby."  The instant suit clearly arises out of the subject matter of the agreements, and therefore falls within the forum selection clause.  Having conceded that the forum selection clause represented a waiver of sovereign immunity in regard to the terms of the payment agreement and share pledge agreement, the Government cannot attempt to prevent the waiver from extending to claims clearly contemplated by the forum selection clause.

22

On April 12, 2005, the district court found the Government in contempt of the preliminary injunction and issued a contempt order. The court imposed a $50,000 per diem fine until the Government complied with the order and awarded appellants attorneys' fees and expenses for bringing the contempt motion. After a bench trial, at the conclusion of which the court held for the Government, the district court vacated the preliminary injunction and contempt order. Appellants contend that they are entitled to attorneys' fees and costs connected to bringing the motion for contempt, and that the district court abused its discretion in vacating that portion of the contempt order.[14]

In general, if the injunction upon which an order was based is later vacated, the party's right to relief under the order is eliminated. United States v. United Mine Workers, 330 U.S. 258, 294-95, 67 S. Ct. 677, 696 (1947) ("The right to remedial relief falls with an injunction which events prove was erroneously issued."); Lewis v. S.S. Baune, 534 F.2d 1115, 1119 (5th Cir. 1976)[15] ("A judgment

---

[14] Appellants concede that the district court's per diem order is moot; they do not challenge on appeal the district court's decision to vacate that part of the order. Appellants assert that the preliminary injunction should not have been vacated, and argue that it should be resurrected for the period that it was in effect, i.e., from the time it was issued until the denial of a permanent injunction. We do not address this issue because it is unclear what relief resurrecting the preliminary injunction would afford appellants: they have conceded that the per diem fine is moot and, as discussed infra, we are remanding the issue of attorneys' fees and costs for further proceedings in the district court.

[15] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down

of civil contempt, being remedial in nature, stands or falls with the validity or invalidity of the order, and the opposing party should be compensated only if he was entitled to the order . . . . ") (citations omitted). After holding for the Government, the district court concluded that the preliminary injunction and contempt order had been erroneously issued and vacated both. In light of our holding that appellants were entitled to the two Article 90(D)(ii) C directorships, the preliminary injunction and contempt order were not necessarily entered erroneously.[16] Thus, we remand the issue of attorneys' fees and costs for a determination of what fees and costs, if any, should be awarded to appellants, recognizing that such an award is committed to the discretion of the district court. Sizzler Family Steak Houses v. W. Sizzlin Steak House, Inc., 793 F.2d 1529, 1534 (11th Cir. 1986). Again, we leave for the district court to determine whether a stay or a hearing on costs and fees is appropriate, given the pending appeal in the Privy Council.

Accordingly, the judgment of the district court is

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

prior to the close of business on September 30, 1981.

[16] For example, pursuant to the decision of the Belizean court, to which we defer, the Government wrongly replaced the two C directors who had been appointed by appellants pursuant to Article 90(D)(ii). On the other hand, we have sustained the Government's replacement of the two C directors appointed pursuant to Article 90(D)(i).