[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 13-13877 & 14-12543
_____

D.C. Docket No. 1:13-cv-20544-KMM

ARCHITECTURAL INGENIERIA SIGLO XXI, LLC,
a Florida limited liability company,
SUN LAND & RGITC LLC,
a Florida limited liability company
f.k.a. Sun Land RGITC, Co.,

Plaintiffs–Appellees,

versus

DOMINICAN REPUBLIC,
a foreign state,
INSTITUTO NACIONAL DE RECURSOS HIDRAULICOS,
a foreign government agency,

Defendants–Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(June 10, 2015)

Before HULL and DUBINA, Circuit Judges, and BOWEN,[*] District Judge.

DUBINA, Circuit Judge:

These appeals arise from an action brought by two Florida companies against a foreign nation and one of its instrumentalities under the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611. Plaintiffs Sun Land & RGITC LLC and Architectural Ingenieria Siglo XXI, LLC sued Defendants Dominican Republic and INDRHI[1] for breach of contract and unjust enrichment related to an irrigation project in the Dominican Republic.[2] Because the Dominican Republic and INDRHI did not timely answer the complaint, the district court entered a default judgment in favor of Sun Land and Architectural, awarding damages that cumulatively exceeded $50 million.

Eight days after the entry of the default judgment, the Dominican Republic and INDRHI entered an appearance; and ten days thereafter, they moved to vacate the default judgment for excusable neglect under Federal Rule of Civil Procedure 60(b)(1). The district court denied their motion, and they timely appealed. While that appeal was pending, the Dominican Republic moved to vacate the default judgment for voidness under Rule 60(b)(4). On reconsideration, the district court

---

[*] Honorable Dudley H. Bowen, Jr., United States District Judge for the Southern District of Georgia, sitting by designation.

[1] INDRHI is an acronym for Instituto Nacional de Recursos Hidráulicos, the National Institute for Hydraulic Resources.

[2] It is undisputed that each Defendant is a "foreign state" under the FSIA. The Dominican Republic is a foreign nation, and INDRHI is a governmental agency under the executive branch of the Dominican Republic responsible for the planning, operation and construction of water-works projects in that nation. *See* 28 U.S.C. § 1603(a)–(b).

2

denied the motion on the merits, finding that the foreign nation had waived its sovereign immunity.  The Dominican Republic timely appealed that ruling as well. We consolidated both appeals and now reverse the district court's orders on the Defendants' Rule 60(b) motions.

## I.

Sun Land and Architectural's breach-of-contract action is based on several documents, which they collectively refer to as "the Contract."  Because whether the district court had subject-matter jurisdiction over the claims against the Dominican Republic depends on the nature and content of these documents, we begin with an overview of their key terms.

## A.

In 2000, INDRHI proposed the construction of an irrigation project in the Dominican Province of Azua.  This project, commonly referred to as Azua II, was intended to provide irrigation to an area totaling 3000 hectares.  INDRHI and STP[3] (the Technical Secretary) invited contractors to bid on the project.  Each bid had to be for a turnkey project that, among other things, provided for the financing necessary to complete the project.  To arrange the financing component of its bid, Architectural asked Sun Land to participate.  Ultimately, its $51.8 million bid for the Azua II project was the winning bid.

---

[3] STP is the acronym for Secretario Tecnico de la Presidencia de la República Dominicana, or Technical Secretary of the Presidency of the Dominican Republic.  This position was later renamed and is currently referred to as the Ministerio de Economía, Planificación y Desarrollo, or Ministry for Economy, Planning, and Development.  The Technical Secretary is not a party to this action.

**B.**

In November 2001, the President of the Dominican Republic issued Special Power 691-01, authorizing the Technical Secretary and INDRHI—"in the name and representation of the Dominican State"—to enter into two agreements regarding the Azua II project: (1) a financing agreement with the Florida Export Finance Corporation and other commercial banks, with the guarantee of the Export–Import Bank of the United States, to obtain the funds needed to complete Azua II; and (2) a commercial agreement with Architectural to provide the services needed to complete the Azua II project.

**C.**

In February 2002,[4] INDRHI, the Technical Secretary, and Sun Land entered into a purchase agreement. Under this agreement, INDRHI agreed to buy the "Products" (e.g., the raw materials) and the "Services" (e.g., civil engineering, architectural designs, and supervision) needed for the Azua II project from Sun Land. To fund this purchase, the Technical Secretary agreed to obtain financing through Sun Land, an authorized agent of the Export–Import Bank. In return, INDRHI and the Technical Secretary agreed to pay Sun Land the total purchase price of $51.8 million, an amount that was "guaranteed with the full faith and credit of the Dominican Government."

Several other provisions of the purchase agreement are relevant here.

---

[4] While the Technical Secretary and Sun Land executed the purchase agreement in December 2001, INDRHI did not do so until February 2002.

4

First, the purchase agreement made plain that the Technical Secretary had been "empowered by the Executive to sign [that agreement] with the Full Faith and Credit of the Government on behalf of the country."

Second, Sun Land had "an absolute right to subcontract" any of its obligations or duties under the purchase agreement; and INDRHI and the Technical Secretary "agree[d] to execute any additional documentation [Sun Land] . . . may deem necessary to effectuate the terms and conditions of this agreement."

Third, INDRHI and the Technical Secretary "acknowledge[d] and agree[d]" that they were not entitled to "immunity on the grounds of sovereignty or otherwise" because the activities contemplated by the purchase agreement were "commercial in nature rather than governmental or public."  INDRHI and the Technical Secretary—"in respect to themselves"—then "expressly and irrevocably waive[d] any such right of immunity."

Fourth, the parties submitted to the jurisdiction of the federal court sitting in Miami, Florida for any action "arising out of or relating to this agreement or notes or any of the transactions contemplated thereby."

Fifth, the parties agreed that Florida law would govern the construction and enforcement of the purchase agreement.

Sixth, INDRHI and the Technical Secretary "designate[d], appoint[ed] and empower[ed]" the Dominican Ambassador or any Dominican Consul to receive service of process on their behalf.  They also agreed that service of process could be made personally or by mailing or delivering a copy of the summons and

5

complaint to the Dominican Ambassador, any Dominican Consul, or the address listed in the purchase agreement.

Once executed, the purchase agreement was submitted for legislative approval.  In November 2002, the Dominican National Congress passed a resolution approving the purchase agreement, which the legislature described as a document executed by "the Dominican State, represented by the Technical Secretary of the Presidency . . . and [INDRHI]" under Special Power 691-01.[5]

### D.

In March 2002, INDRHI and Architectural entered into Contract 10375 for the studies, design, and construction of the Azua II project.  According to the preamble—"an integral part of" Contract 10375—the Technical Secretary had instructed INDRHI "to serve as the executing entity" for the Azua II project.  Also, as both its preamble and articles made clear, Contract 10375 had been entered into and was to be performed in accordance with the purchase agreement.

Under Contract 10375, INDRHI did not submit to U.S. jurisdiction, agree to a special arrangement for service of process, or explicitly waive its sovereign immunity.  Instead, the parties submitted to jurisdiction in the courts of Santo Domingo, agreed that Dominican law governed the agreement, and provided that certain disputes should be arbitrated in the Dominican Republic.

---

[5] In their complaint and brief on appeal, Sun Land and Architectural reference a certification of the Dominican Senate's July 2002 approval of the purchase agreement, treating this certification as distinct from the November 2002 National Congress resolution.  Given that the National Congress resolution is a bicameral action, it is unclear whether the Senate's approval is actually distinct.

6

Contract 10375 was ultimately replaced with a more comprehensive document and thus is not part of what Sun Land and Architectural call "the Contract."  As a result, Sun Land and Architectural do not allege that the Dominican Republic or INDRHI breached Contract 10375.  Even so, this document remains relevant here because several documents that are part of the Contract explicitly incorporate Contract 10375's terms.

## E.

In February 2004, INDRHI, Sun Land, and Architectural executed the protocol for the execution of the purchase agreement.  The protocol explicitly superseded Contract 10375 and set forth each party's responsibilities regarding the Azua II project, including the construction and payment procedures.  After acknowledging that "there [we]re several Agreements that relate[d] to and [we]re material to the construction and financing" of the Azua II project, the parties expressly provided that the terms of the purchase agreement trumped any conflicting terms in the protocol.

The protocol, like the purchase agreement, included several additional provisions that are relevant here.

First, INDRHI "acknowledge[d] and agree[d]" that it was not entitled to "immunity on the grounds of sovereignty or otherwise . . . in any legal proceeding arising out of or relating to **THE PROTOCOL**" because the activities contemplated by the protocol were "commercial in nature rather than governmental

7

or public." INDRHI then "expressly and irrevocably waive[d] any such right of immunity."

Second, the parties submitted to the jurisdiction of the federal court sitting in Miami, Florida for any action "arising out of or relating to this **PROTOCOL** or any of the transactions contemplated thereby."

Third, the parties agreed that Florida law would govern the construction and enforcement of the protocol.

Fourth, INDRHI "designate[d], appoint[ed] and empower[ed]" the Dominican Ambassador or any Dominican Consul to receive service of process on its behalf. It also agreed that service of process could be made personally or by mailing or delivering a copy of the summons and complaint to INDRHI "in care of its agent designated above."

With the purchase agreement and the protocol in place, work on the Azua II project was ready to begin.

## F.

In March 2004, Architectural received word from INDRHI to begin the Azua II project, and it did so. Over the next 30 months, Architectural worked on the irrigation project as INDRHI directed, which included complying with its numerous orders to cease all work as well as its countermands to recommence.

In March 2006, INDRHI sent a letter to Architectural approving an itemized list of the "Components of Works in New Contract" that updated and expanded the scope of the Azua II project. Sun Land and Architectural have characterized this

8

letter at least three different ways: (1) in their complaint, they called it "an Agreement"; (2) in their motion for default judgment, they referred to it as "a [N]ew Contract"; and (3) in their brief on appeal, they define it as "the 'Amendment.'"  Here, we refer to this document as "the Amendment."

With the addition of the components referenced in "the Amendment," the total cost of the Azua II project ballooned to $106.1 million.  Once financing for this expansion was secured in June 2007, INDRHI instructed Architectural to begin working on the project again.

### G.

In November 2007, INDRHI and Architectural entered into the first of three addenda.  The first addendum covered structural repairs to sections of the Yaque del Sur-Azua Canal, a system of water pathways in the geographic region of the Azua II project.  The total cost of this work was $63.4 million Dominican pesos.  After Architectural performed part of the work contemplated by this addendum, it presented INDRHI with an invoice for $40.1 million Dominican pesos, which was paid in full.

In January 2008, INDRHI and Architectural entered into the second addendum to repair sections of the Yaque del Sur-Azua Canal damaged by Tropical Storm Noel.  Architectural performed the work contemplated by this addendum and presented INDRHI with an invoice for $44.5 million Dominican pesos, which was paid in full.

9

Finally, in July 2008, INDRHI and Architectural entered into the third addendum to repair sections of the Yaque del Sur-Azua Canal damaged by Tropical Storm Olga. After Architectural performed the work contemplated by the addendum, it submitted a partial invoice to INDRHI for $55.1 million Dominican pesos, which was paid in part. INDRHI still owes $18.4 million Dominican pesos on this invoice.

Each addendum purported to modify the terms of Contract 10375 between INDRHI and Architectural. For example, the third addendum provided, "All other remaining Articles of Contract 10375 that have not been modified remain in full effect, the same as the Documents of the Contract that are not modified by effect of the present Addendum." That addendum also provided that it would "not have to be ratified by any other party, due to the fact that the necessary funds involved in [the addendum] will come directly from the Dominican state." None of the addenda expressly refer to either the purchase agreement or the protocol.

According to Sun Land and Architectural's complaint, the purchase agreement, the protocol, and the three addenda comprise "the Contract." On appeal, as in the district court, they also contend that "the Amendment" is part of the Contract.

## H.

In October 2008, INDRHI sent a letter to the legal counsel for the Dominican Executive Branch. In this letter, the agency described Architectural's performance as "satisfactory, fully complying with their obligations as principal

10

contractor, despite the lack of payment of several invoices." The agency also noted that Sun Land's work had been "executed without any problems."

Even so, in February and June 2009 as well as in October 2010, INDRHI sent Sun Land and Architectural correspondence attempting to terminate their work under the protocol and the first and third addenda. In 2011, a Brazilian company was hired to complete the Azua II project.

## II.

In February 2013, Sun Land and Architectural filed this action against the Dominican Republic and INDRHI. The next day, service of the original summonses and complaint was made on the Office of the Consulate General of the Dominican Republic in Miami, Florida. These documents were received by an "auxiliary consul," a person performing clerical duties at the consulate, who then delivered them to Gina Lacayo, "the assistant" to the Miami Consul General. This assistant position is a secretarial position, and there is no evidence that Lacayo had any management duties at the Miami consulate. Indeed, at the time of service, Lacayo had served in this secretarial capacity for only three months, though she had been an auxiliary consul (a clerical position) for nearly 12 years before taking this job.

After receiving these documents, Lacayo contacted Ramon Burgos, a Dominican lawyer in Santo Domingo, who worked as an assistant legal counsel to the Dominican government. According to her declaration, she did so to confirm her understanding that the Miami consulate was not authorized to accept service of

11

process.  Without reading the complaint herself or providing Burgos a copy to review (and apparently he never asked to see the complaint), Lacayo explained to Burgos that the Miami consulate had mistakenly received legal documents naming the Dominican Republic as a defendant in a U.S. legal action.  Burgos then confirmed her understanding that under both Dominican law and the Vienna Convention, the Miami consulate should not have received or accepted service for a lawsuit against the Dominican Republic.

Having confirmed her understanding, Lacayo called Sun Land and Architectural's counsel to explain that the Miami consulate was not authorized to accept service of process.  During this call, Plaintiffs' counsel explained that the Miami consulate could accept service in this case because it was contractually authorized to do so.  But Lacayo disagreed.  Given her conversation with Burgos and the Miami consulate's longstanding policy against accepting service of process, she suggested that Plaintiffs' counsel send these documents to the Dominican Embassy in Washington, D.C.

In early April, Sun Land and Architectural mailed the Dominican Ambassador in Washington a certified letter that included copies of the summonses and complaint and emailed him a copy of that letter without attaching a copy of the complaint;[6] a copy of this letter was also sent to the Miami consulate.  When

---

[6] According to the Dominican Republic and INDRHI, the Dominican Embassy has no record that it received either the letter or the email.  The district court did not resolve this factual dispute in ruling on the Defendants' Rule 60(b)(1) motion.  Rather, the district court relied only on the receipt of the complaint and service papers by a secretary in the Dominican Republic's Miami consulate.

12

Lacayo received this letter, she again called Plaintiffs' counsel to notify him that the Miami consulate was not authorized to receive service of process for the Dominican Republic and to request that he stop sending legal documents to the Miami consulate. According to counsel's affidavit, Lacayo "advised that there would be no response because the Defendants had not been properly served, and told me to read the Vienna Convention." Lacayo, in contrast, explained in her declaration that she "never said that the government of the Dominican Republic would not be taking any action in response to the Complaint and Summons. I was not then, and I am not now[,] authorized to speak on behalf of the government of the Dominican Republic." In any event, Lacayo said that in light of the April letter, it was her understanding that the Embassy was handling this matter.

In mid-April, the clerk of the district court entered default and mailed a copy to the Miami consulate. Sun Land and Architectural moved for a default judgment a month later. A process server delivered copies of this motion to the Miami consulate. Although Lacayo received them, because she believed that the Embassy was handling this matter, she simply filed the motion. Sun Land and Architectural also assert that they sent copies of this motion to INDRHI and the Dominican Republic Ministry of Economy, Planning, and Development (formerly known as the Technical Secretary) by Federal Express.

In June, four months after Lacayo, the Miami Consul General's secretary, first received service of process, the district court entered a default judgment against the Dominican Republic and INDRHI, and they were served with a copy of this judgment at the Miami consulate and by Federal Express in the Dominican

13

Republic.  Eight days later, they entered an appearance; and ten days thereafter, they moved to vacate the default judgment for excusable neglect under Rule 60(b)(1).  The district court denied their motion, finding that they had not established a good reason for failing to respond to the complaint.  The Dominican Republic and INDRHI timely appealed.

While that appeal was pending, the Dominican Republic moved to vacate the default judgment for voidness under Rule 60(b)(4).  On reconsideration, the district court denied the motion on the merits, finding that the foreign nation had waived its sovereign immunity.  The Dominican Republic timely appealed that ruling as well.  We consolidated both appeals.

## III.

Several standards of review govern these appeals.  We review jurisdictional questions de novo, *Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1324 (11th Cir. 2003), and the district court's factual findings for clear error, *Aquamar, S.A. v. Del Monte Fresh Produce*, 179 F.3d 1279, 1290 (11th Cir. 1999).

We review the district court's ruling on a Rule 60(b)(4) motion to set aside default judgment for voidness de novo.  *Stansell v. Revolutionary Armed Forces of Colom.*, 771 F.3d 713, 736 (11th Cir. 2014).  "A judgment can be set aside for voidness where the court lacked jurisdiction or where the movant was denied due process."  *Id.*  "Voidness for purposes of a 60(b)(4) motion contemplates lack of jurisdiction or defects in due process that deprive a party of notice or an opportunity to be heard."  *Id.* at 737.

14

We review the district court's denial of a Rule 60(b)(1) motion to set aside a default judgment for excusable neglect for an abuse of discretion. *Valdez v. Feltman (In re Worldwide Web Sys., Inc.)*, 328 F.3d 1291, 1295 (11th Cir. 2001). An abuse of discretion occurs where the district court misapplies the law or bases its conclusions on clearly erroneous factual findings. *Broadcast Music, Inc. v. Evie's Tavern Ellenton, Inc.*, 772 F.3d 1254, 1257 (11th Cir. 2014).

## IV.

On appeal, the Dominican Republic challenges whether the district court had subject-matter jurisdiction over all or part of Sun Land and Architectural's breach-of-contract claim.

## A.

The FSIA is the sole "basis for obtaining jurisdiction over a foreign state," *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 443 109 S. Ct. 683, 693 (1989), because this Act endows a foreign state with presumptive immunity to suits in U.S. courts unless a statutory exception applies, *Saudi Arabia v. Nelson*, 507 U.S. 349, 355, 113 S. Ct. 1471, 1476 (1993); *see* 28 U.S.C. §§ 1604, 1605(a). To determine whether subject-matter jurisdiction under the FSIA exists, a court looks at the plaintiff's allegations and any undisputed facts that the parties have put forward. *Butler v. Sukhoi Co.*, 579 F.3d 1307, 1313 (11th Cir. 2009). Once the plaintiff shows that a statutory exception to the FSIA applies, "the burden then shifts to the defendant to prove, by a preponderance of the evidence, that the plaintiff's claims do not fall within that exception." *Id.*

15

For purposes of the FSIA, a foreign state expressly waives its right to immunity only where its intent to do so is clear and unambiguous.  *Aquamar*, 179 F.3d at 1292; *accord World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1162 (D.C. Cir. 2002).  And as a general rule, "explicit waivers of sovereign immunity are narrowly construed 'in favor of the sovereign' and are not enlarged 'beyond what the language requires.'"  *World Wide Minerals*, 296 F.3d at 1162 (quoting *Library of Cong. v. Shaw*, 478 U.S. 310, 318, 106 S. Ct. 2957, 2963 (1986)).

The FSIA also recognizes that a foreign state may waive its sovereign immunity implicitly, but the Act itself does not define implicit waiver.  *See* § 1605(a)(1).  We have recognized that implicit waiver is a narrow exception that generally applies only if "the foreign state reveals its intent to waive its immunity by: (1) agreeing to arbitration in another country, (2) agreeing that the law of a particular country should govern a contract, or (3) filing a responsive pleading in an action without raising the defense of sovereign immunity."  *Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285, 1287 (11th Cir. 2005).

Here, Sun Land and Architectural alleged that the district court had subject-matter jurisdiction over their claims against the Dominican Republic based on its express and implied waivers of immunity in "the [C]ontract (herein later described as the [Protocol], Purchase Agreement, and addenda and amendments thereto)" as well as its commercial activity within the United States or its extraterritorial commercial activity that had a direct effect within the United States.  *See* § 1605(a)(1)–(2).

16

Because Sun Land and Architectural sought to invoke the jurisdiction of the U.S. courts to enter a judgment on their claims against the Dominican Republic, they had to present a prima facie case that jurisdiction existed.[7] *Butler*, 579 F.3d at 1313. "Where, as here, the party asserting immunity under the FSIA does not contest the alleged jurisdictional facts, but rather, challenges their legal adequacy, we review *de novo* the complaint's jurisdictional allegations to determine whether they were sufficient to eliminate the appellants' presumptive immunity." *Id.*

**B.**

The district court concluded that all of the documents comprising what Sun Land and Architectural call "the Contract" constituted "one overall agreement" and that the waivers of sovereign immunity in the purchase agreement and the protocol thus applied to each document.[8] This conclusion was warranted, the court reasoned, because this collection of documents "all relate[d] to each other and include[d] numerous statements that INDRHI and the Technical Secretary of the President signed and executed the agreements in the name of and as a representative of Defendant Dominican Republic." Doc. 56 at 4. Additionally, the court concluded that "Defendant Dominican Republic is interchangeable as a party

---

[7] Here, the Dominican Republic's status as a "foreign state" within the meaning of the FSIA was uncontested; otherwise, the Dominican Republic would first have had to present a prima facie case that it was entitled to immunity under the Act. *See Butler*, 579 F.3d at 1313 n.8.

[8] Although the district court's order states that all of the documents attached to the complaint constitute "one overall agreement," Sun Land and Architectural's allegations do not go this far. As a result, we construe the court's statement so that it reaches only those documents attached to the complaint that they contend on appeal comprise the Contract: the purchase agreement, the protocol, the three addenda, and "the Amendment."

to the agreements wherever INDRHI or the Technical Secretary of the President are Parties." *Id.* at 5. Consequently, the court concluded that the Dominican Republic was subject to its jurisdiction under the FSIA for its alleged breach of the purchase agreement, the protocol, the addenda, and "the Amendment" because of the foreign nation's waivers of sovereign immunity. Based on our review of the record, however, we cannot fully agree.

## 1.

The Azua II project began with Sun Land and Architectural's $51.8 million winning bid—a bid that accounted for the financing, design, and construction of the 3000 hectare irrigation project. As a result, the documents (and amendments thereto) executed to bring this project to fruition should be read together. *See* Restatement (Second) of Contracts § 202(b) ("[A]ll writings that are part of the same transaction are interpreted together."). This is true even though the parties to these documents were not the same because "the writings form part of a single transaction and are designed to effectuate the same purpose." 11 *Williston on Contracts* § 30:26 (4th ed. West 2015). And it is true even though these agreements were executed on different dates, given "the fact that they were made on different occasions [is] insignificant if they are related to and were part of the same transaction." *Id.*; *accord J.M. Montgomery Roofing Co. v. Fred Howland, Inc.*, 98 So. 2d 484, 486 (Fla. 1957) ("[I]nstruments entered into on different days but concerning the same subject matter, may under some circumstances be

18

regarded as one contract and interpreted together." (quoting 7 *Florida Jurisprudence: Contracts* § 78)).

So while the purchase agreement and the protocol were executed on separate dates and involved different parties, we conclude from the record that they are part of the same transaction—the Azua II project—as both were essential to bringing that project to fruition.  The same however cannot be said for the three addenda and "the Amendment" that were entered into after work began on the Azua II project.

The three addenda were executed by INDRHI and Architectural and explicitly incorporated the terms of Contract 10375.  Despite this, Architectural contends that they were amendments to the protocol.  We disagree for two reasons.

First, the protocol provided that any amendments could occur only with the written consent of all parties.  Because Sun Land was a party to the protocol but not these addenda, the addenda were not properly executed amendments of the protocol.

Second, "where a writing expressly refers to and sufficiently describes another document, that other document, or so much of it as is referred to, is to be interpreted as part of the writing."  *OBS Co. v. Pace Constr. Corp.*, 558 So. 2d 404, 406 (Fla. 1990).[9]  This rule applies here because INDRHI and Architectural clearly

---

[9] *See also* 11 *Williston on Contracts* § 30:25 ("As long as the contract makes clear reference to the document and describes it in such terms that its identity may be ascertained beyond doubt, the parties to a contract may incorporate contractual terms by reference to a separate, noncontemporaneous document, including a separate agreement to which they are not parties, and including a separate document which is unsigned." (footnotes omitted)).

19

and unambiguously incorporated the terms of Contract 10375 into each addendum. Having done so, we must glean the parties' intent from the four corners of these documents. *Crawford v. Barker*, 64 So. 3d 1246, 1255 (Fla. 2011). After all, the best evidence of intent is the contract's own language, and its plain meaning controls. *Id.*

INDRHI and Architectural chose to incorporate Contract 10375's terms, rather than those of the protocol, into each addendum. And they did so even though Contract 10375 was expressly superseded by the protocol more than three and a half years before the first addendum was executed. Although the repair work contemplated by each addendum was similar in kind to that performed as part of the Azua II project, the work under each addendum was not directly related to the Azua II project. Nor were the payment terms the same: work related to the Azua II project was to be paid for in U.S. dollars, but work under each addendum was to be paid for in Dominican pesos. For these reasons, we cannot conclude on the current record that the three addenda should be interpreted together with the purchase agreement and the protocol—documents that they never explicitly reference—nor can we conclude that the addenda amended the protocol.

"The Amendment" fares no better. In their complaint, Sun Land and Architectural allege that "the parties" executed "an Agreement" (which they refer to as "the Amendment" on appeal) in March 2006 to "update and define" the scope of the Azua II project. To substantiate their allegation, they attached a copy of this document to their complaint. But after reviewing it, we are unpersuaded that it

20

constitutes an amendment of either the purchase agreement or the protocol, the documents memorializing the Azua II project.

For starters, this document is signed only by INDRHI, not "the parties" as Sun Land and Architectural alleged. So this document was not a properly executed amendment of either the purchase agreement or the protocol. Next, the document itself contained no terms or obligations, nor did it incorporate the terms of any other contract. On its face, "the Amendment" is thus neither an amendment of a document that relates to the Azua II project nor a stand-alone agreement. Consequently, based solely on our review of "the Amendment,"[10] we cannot conclude that the scope of the Azua II project was indeed extended in March 2006.

In sum, our review of the record persuades us that the only documents attached to the complaint that relate to the Azua II project are the purchase agreement and the protocol. Because the damages awarded via default judgment were partially based on the three addenda and "the Amendment," we hold that the district court erred by denying the Dominican Republic's Rule 60(b)(4) motion and thus must reverse the default judgment entered against the foreign nation. *See Burke v. Smith*, 252 F.3d 1260, 1263 (11th Cir. 2001) ("[A] judgment is void under Rule 60(b)(4) if the court that rendered it lacked jurisdiction of the subject matter.").

---

[10] Because "the Amendment" contradicts Sun Land and Architectural's allegation, this allegation is not entitled to a presumption of veracity. *See Crenshaw v. Lister*, 556 F.3d 1283, 1292 (11th Cir. 2009) ("It is the law in this Circuit that 'when the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern.'" (quoting *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007))).

21

Even so, the larger question remains: whether the Dominican Republic has *any* amenability to suit in U.S. courts in this action. In a word, yes.

**2.**

Here, because at least one statutory exception to the FSIA applies, the Dominican Republic is amenable to the jurisdiction of U.S. courts. *See* 28 U.S.C. §§ 1604, 1605(a); *Saudi Arabia*, 507 U.S. at 355, 113 S. Ct. at 1476.

The Dominican Republic is a party to the purchase agreement. The Technical Secretary signed the purchase agreement and did so after having been "empowered by the Executive to sign [that agreement] with the Full Faith and Credit of the Government on behalf of the country." Indeed, nothing in the record suggests that the Technical Secretary (now the Minister of Economy, Planning, and Development) is not simply one of many actors through which the Dominican Republic carries out its sovereign affairs. *Cf. First Fid. Bank, N.A. v. Gov't of Antigua & Barbuda—Permanent Mission*, 877 F.2d 189, 192 (2d Cir. 1989) ("Normally, of course, a state authorizes a representative to act on its behalf."). In other words, like most foreign ministers, the Technical Secretary is simply "part of the sovereign itself." *Garb v. Republic of Poland*, 440 F.3d 579, 595 (2d Cir. 2006) (quoting *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 152 (D.C. Cir. 1994)); *see also S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1298 (11th Cir. 2000) (treating the Yemini Ministry of Supply & Trade

22

as "admittedly" a political subdivision of the Republic of Yemen). Thus, the Dominican Republic is bound by the purchase agreement's terms.[11]

The Dominican Republic waived its sovereign immunity in the purchase agreement. As recounted above, the purchase agreement contains both a clear and unambiguous explicit waiver of sovereign immunity and an implicit waiver of sovereign immunity (i.e., a provision providing that Florida law governs the agreement). *See Aquamar*, 179 F.2d at 1292; *Calzadilla*, 413 F.3d at 1287. Hence, only one question remains: what is the scope of the waiver?

According to the Dominican Republic, the purchase agreement's waiver of sovereign immunity extends only to future loans, not the construction project around which Sun Land and Architectural's complaint is built. We disagree.

The purchase agreement's waiver provision sweeps broadly. The parties to that agreement—which includes the Dominican Republic—submitted to the jurisdiction of the federal court sitting in Miami, Florida for any action "arising out of or relating to this agreement *or* notes *or* any of the transactions contemplated

---

[11] In its reply brief, the Dominican Republic contends that nothing in the record supports Sun Land and Architectural's statements that the Technical Secretary is not an agency or instrumentality of the Dominican Republic and that the Technical Secretary is simply part of the Dominican Republic. We disagree. First, to the extent that the Dominican Republic argues that the Technical Secretary and the Dominican Republic are separate juridical entities, the foreign nation waived this argument by not raising it in its opening brief. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 682–83 (11th Cir. 2014). Second, even if the Dominican Republic has not fully waived its argument, the fact remains that foreign ministers are generally presumed to be part of the sovereign they represent. After all, sovereigns, like other entities, must act through agents. And while the burden of showing that the presumption of separateness has been overcome ultimately falls on the plaintiff, "the initial burden of presenting a *prima facie* case that [the entity in question] is a foreign state" under the FSIA falls on the defendant. *See Butler*, 579 F.3d at 1313.

23

thereby." Purchase Agreement art. 23 (emphasis added). The design and construction of the Azua II project were transactions contemplated by the purchase agreement—indeed, they were part of the "Services" that Sun Land agreed to provide and the Technical Secretary and INDRHI agreed to pay for under that agreement. We thus conclude that the purchase agreement's waiver of sovereign immunity is not limited to future loans but rather reaches the construction project at the heart of this action. Because the protocol merely memorializes the parties' responsibilities vis-à-vis the Azua II project, the protocol constitutes a transaction contemplated by the purchase agreement. Accordingly, we hold that the district court did not err in concluding that the Dominican Republic's waiver of sovereign immunity extends to the protocol.

**3.**

Lastly, Sun Land and Architectural contend that the Dominican Republic was also subject to the jurisdiction of U.S. courts based on its commercial activity. *See* § 1605(a)(2). At least for purposes of establishing subject-matter jurisdiction over the Dominican Republic's alleged breach of the three addenda and "the Amendment," we disagree.

The FSIA presumes that a foreign state and its instrumentalities are separate legal entities. *See* § 1603(b)(1) (defining *instrumentality of a foreign state* as, among other things, "a separate legal person"); *cf. First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611, 625–28, 103 S. Ct. 2591, 2599–2601 (1983) (discussing nature of government instrumentalities and

24

presumption of separateness for purposes of substantive liability); *Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d 1277, 1284 (11th Cir. 1999) ("[G]overnment instrumentalities enjoy a presumption of separate juridical status vis-à-vis the foreign government to which they are related."). And the burden of overcoming this presumption falls on the plaintiff. *S & Davis Int'l*, 218 F.3d at 1298–99 (discussing allocation of burden and two ways of overcoming this presumption).

Based on our review of the record, we conclude that Sun Land and Architectural have failed to overcome the presumption that INDRHI—the only Dominican entity to sign the three addenda and "the Amendment"—is separate from the Dominican Republic. Thus, we cannot affirm the district court's conclusion that the Dominican Republic is amenable to suit in federal court for the foreign nation's alleged breach of these documents under the FSIA's commercial-activity exception.

## V.

Under Rule 60(b)(1), the district court has discretion to relieve a party from a final judgment for "mistake, inadvertence, surprise, or excusable neglect." Even so, in ruling on a Rule 60(b)(1) motion, "the discretion of the district court is not unbounded, and must be exercised in light of the balance that is struck by Rule 60(b) between the desideratum of finality and the demands of justice." *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 402 (5th Cir. Unit A Jan. 1981). Our review of the district court's ruling is informed by that same consideration; "and where

25

denial of relief precludes examination of the full merits of the cause, even a slight abuse may justify reversal." *Id.*

At the same time, our caselaw makes clear that the party seeking relief under Rule 60(b)(1) must provide a justification so compelling that the district court had to vacate the challenged order. *Cavaliere v. Allstate Ins. Co.*, 996 F.2d 1111, 1115 (11th Cir. 1993). To do so, the defaulting party must establish that "(1) it had a meritorious defense that might have affected the outcome; (2) granting the motion would not result in prejudice to the non-defaulting party; and (3) a good reason existed for failing to reply to the complaint." *Ehlers*, 8 F.3d at 783, *quoted in In re Worldwide Web Sys.*, 328 F.3d at 1295.

Here, the district court denied the Dominican Republic and INDRHI's Rule 60(b)(1) motion, finding that they "lacked a good reason for failing to respond to the Complaint or the multiple other communications that they received in this matter." Doc. 30 at 9. For this reason, the court did not decide whether the Dominican Republic and INDRHI had a meritorious defense or whether granting relief would prejudice Sun Land and Architectural. On appeal, the Dominican Republic and INDRHI argue that the court abused its discretion in denying their motions. We agree.

To conclude that the Dominican Republic and the INDRHI made a "willful decision" to not respond to the complaint as a "tactical maneuver," Doc. 30 at 8, the district court relied on several factual findings. These findings were based solely on the court's assessment of Lacayo's conduct given its conclusion that

26

resolving "the validity of the communications sent to the Embassy or the Dominican Republic directly" was unnecessary. *Id.* at 7 n.5.

The district court found that the Dominican Republic and INDRHI "acknowledged receiving the [c]omplaint" and that they "twice reached out to Plaintiffs to inform them that they would not respond because of a disagreement as to the validity of service." *Id.* at 7. The court also found that the Dominican Republic and INDRHI's failure to answer the complaint could not be excused as a clerical error. In the district court's view, Lacayo was not a junior employee because she had been employed at the Miami consulate for twelve years and was "the assistant" to the Consul General. *Id.* at 8. Indeed, the court noted that Lacayo was "senior enough" (or "felt senior enough") in this position to twice call Sun Land and Architectural's counsel and "inform them that no response would be forthcoming." *Id.* The court thus concluded that the Dominican Republic and INDRHI "put themselves" in a position to face a default judgment of more than $50 million "through their adamant and repeated refusals to participate in the legal process." *Id.* at 9.

Based on our thorough review, we conclude that the factual findings underlying the district court's decision were unsupported by the record. Contrary to the court's finding, the record shows that when the complaint was served, Lacayo had been "the assistant" to the Miami Consul General for only three months; in her role as "the assistant," she was still a secretary; and for the twelve years prior to becoming "the assistant," she had held only a clerical position at the Miami consulate. Also, nothing in the record shows that Lacayo had any

27

management duties at the Miami consulate. Thus, the court's finding that she was "senior enough" at the Miami consulate to render her mistake a nonclerical error is unsupported by the record and is thus clearly erroneous.

While Lacayo twice spoke with Sun Land and Architectural's counsel, nothing in the record establishes that anyone with managerial responsibilities within the Dominican Republic government or INDRHI knew anything about this case. Even so, the district court found that the Dominican Republic and INDRHI twice told Sun Land and Architectural's counsel that they were not going to respond to the complaint because they believed that service had been improper. To make this finding, the district court imputed Lacayo's conduct to the Dominican Republic and INDRHI, yet nothing in the record supports doing so. Hence, this finding is also clearly erroneous.

Finally, because nothing in the record establishes that anyone at the Miami consulate other than Lacayo and a clerical employee knew about this action, the court's conclusion that the Dominican Republic and INDRHI willfully decided not to respond to the complaint for tactical reasons is unsupported by the record. At best, the record suggests that their failure to respond was the result of negligence that is excusable. Thus, good reason for their failure to respond to the complaint exists, and we hold that the district court's contrary finding was clearly erroneous.[12]

---

[12] Based on our review of the record, we also conclude that the Dominican Republic and INDRHI have meritorious defenses and that vacating the default judgment will not prejudice Sun Land and Architectural. *See Ehlers*, 8 F.3d at 783.

28

## VI.

Having carefully considered the record in this case, the parties' briefs, and with the benefit of oral argument, we conclude that the district court erred by denying the Dominican Republic's Rule 60(b)(4) motion to vacate for voidness the default judgment entered against the foreign nation. We also conclude that the district court abused its discretion by denying the Dominican Republic and INDRHI's Rule 60(b)(1) motion to vacate for excusable neglect the default judgment entered against them. Accordingly, we reverse the district court's orders and remand this case for further proceedings consistent with this opinion.

REVERSED and REMANDED.