[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-11616

_____

D.C. Docket No. 1:12-cv-20558-WJZ


GDG ACQUISITIONS, LLC,

Plaintiff - Appellant,

versus

GOVERNMENT OF BELIZE,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 22, 2014)

Before MARCUS, Circuit Judge, and COOGLER[*] and BOWEN,[**] District Judges.

MARCUS, Circuit Judge:

---

[*] Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

[**] Honorable Dudley H. Bowen, Jr., United States District Judge for the Southern District of Georgia, sitting by designation.

GDG Acquisitions, LLC ("GDG") alleges that the Government of Belize ("Government") breached a contract for the lease of office telecommunications equipment. Without reaching the merits of the dispute, the district court dismissed on two alternative grounds, pursuant to the doctrines of forum non conveniens and international comity. As we see it, the district court abused its considerable discretion in dismissing for forum non conveniens without first evaluating the significance of a forum-selection clause in the underlying contract. See Atl. Marine Constr. Co. v. U.S. Dist. Court for the W. Dist. of Tex., 134 S. Ct. 568 (2013). Therefore, we vacate the forum non conveniens dismissal and remand to allow the district court to determine the enforceability and significance of the forum-selection clause.

In addition, we vacate the district court's dismissal on the alternative ground of international comity. "Retrospective" international comity does not apply without a judgment from a foreign tribunal or parallel foreign proceedings. See Ungaro-Benages v. Dresdner Bank AG, 379 F.3d 1227, 1238 (11th Cir. 2004). Nor does this commercial contract dispute fall within the markedly more limited reach of "prospective" international comity, a doctrine we have reserved for exceptional diplomatic circumstances. See id.

I.

2

A.

The tale of this case begins with an effort by the Government of Belize (the "Government") to reduce its expenditures on office telephone services. In 2002, Government Minister Ralph Fonseca entered into discussions with a Belizean company, International Telecommunications, Ltd. ("Intelco"), to lease hardware equipment including telephones, cables, routers, and servers. Fonseca negotiated in Florida and in Washington, D.C., with Glenn Godfrey, a former Attorney General of Belize who was the founder and a director of Intelco. Fonseca and Godfrey reached an agreement, though the parties in this litigation now dispute whether Fonseca had the authority to contract on behalf of the Government. On December 18, 2002, Fonseca and Godfrey met in Miami to close the deal with representatives of the International Bank of Miami, a United States bank that financed the deal.

Fonseca, as the Government's "Minister of Budget Management," and Godfrey, as Intelco's "Chairman," signed a "Master Lease Agreement" obligating Intelco to lease the equipment to the Government in exchange for quarterly rent payments totaling $6,748,189.20 between 2003 and 2007. Intelco assigned these payments to the International Bank of Miami for a single upfront cash payment from the bank of $5 million. The Master Lease Agreement characterized itself as a "net lease" that required the Government to make payments unconditionally,

3

without any right to abatement or reduction for any reason.  The lease terms

provided that Intelco had no obligation to provide services once the Government

took possession of the phone equipment in Florida.

The Master Lease Agreement contained provisions stating that the

Government waived its sovereign immunity and consented to suit in the United

States:

> [R]ights and obligations under this Master Lease or any Lease
> Schedule shall be determined exclusively in accordance with the
> governing laws of the State of Florida, irrespective of conflict of law
> principles.  Lessee irrevocably submits to the exclusive jurisdiction of
> any of the federal and state courts in the State of Florida in any action
> or proceeding arising out of or relating to the Master Lease or any
> Lease Schedule, and Lessee hereby irrevocably agrees that all claims
> in respect of such action or proceeding may be heard and determined
> in any court of competent jurisdiction in the State of Florida.

The lease also contained a waiver of objections to venue or to claims of

inconvenient forum:

> Lessee hereby irrevocably waives any objection which it may now or
> hereafter have to the laying of venue of any suit, action or proceeding
> arising out of or relating to the Master Lease or any Lease Schedule
> and hereby further irrevocably waives any claim that any such suit,
> action or proceeding brought in any such court has been brought in an
> inconvenient forum.  Lessee specifically acknowledges that Miami-
> Dade County, Florida is a proper venue for the Lessor to bring suit
> against Lessee pursuant to the Master Lease or any Lease Schedule.

The Master Lease Agreement obligated the Government to return the

equipment to Intelco at the end of 2007 or to continue paying rent at the same rate,

month-to-month, for up to a year.  After one year, the Government had to return

4

the equipment or continue rent payments. Fonseca and Godfrey agreed to a second lease of additional equipment to run from 2003 to 2008, also for $6,748,189.20 in rent and also assigned to the International Bank of Miami, under the terms of the same Master Lease Agreement. The Government made the rental payments in full for the terms of the two leases, totaling $13.5 million. The complaint in this case alleges that the Government has not made any additional lease payments as required by the Master Lease since 2008, even though it continues to possess and use the equipment.

B.

Glenn D. Godfrey, formerly of Intelco, created GDG as a Florida limited liability company, with its principal office in Houston, Texas, on or about January 26, 2012. Godfrey remains GDG's sole member. On or about Feburary 1, Intelco assigned all of its assets to GDG, including its interest in the Belize agreements. On February 10, GDG sued the Government of Belize in the United States District Court for the Southern District of Florida. GDG alleged that the Government owes it approximately $14 million in unpaid rent, with the amount growing each month. The Government maintains that the equipment is defective and that the Master Lease Agreement is null and void because Fonseca lacked constitutional power, and thus actual authority, to sign telecommunications agreements for the Government of Belize.

5

The Government moved the district court to dismiss on three grounds: (1) foreign sovereign immunity pursuant to the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602 et seq.; (2) the doctrine of forum non conveniens; and (3) the doctrine of international comity.  The district court found first that the case should be dismissed because of forum non conveniens.  According to the court, a Belizean forum was available and adequate.  In addition, balancing the private factors, the original contract had been made in Belize between Belizean entities, even though rights under the agreement had been assigned to GDG, an American entity, before the suit commenced.  Witnesses and documents were more readily accessible in Belize and enforcing a judgment would be easier for a Belizean court.  Similarly, the district court found that public interest factors favored dismissal.  Administrative challenges and the difficulty of applying foreign law made trying the case in federal court more burdensome.  Finally, GDG could reinstate its lawsuit in Belize, where the Government was subject to jurisdiction.

The district court alternatively found dismissal appropriate pursuant to the doctrine of international comity, which "encompasses the principle of respect for the acts of sovereign nations."  Belize Telecom, Ltd. v. Gov't of Belize, 528 F.3d 1298, 1305 (11th Cir. 2008).  After weighing the strengths of the foreign and domestic interests in this case, the district court concluded that Belizean interests prevailed because of the need to interpret and apply Belize's law and because the

case involved telecommunications services that could affect the citizens of Belize. The district court did not reach the question of whether foreign sovereign immunity precluded subject matter jurisdiction. See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 432 (2007) ("A district court . . . may dispose of an action by a forum non conveniens dismissal, bypassing questions of subject-matter and personal jurisdiction, when considerations of convenience, fairness, and judicial economy so warrant.").

GDG appealed the dismissal, arguing that the district court erred in its application of both forum non conveniens and international comity. GDG moved for supplemental briefing after the United States Supreme Court decided Atlantic Marine, which addressed the effect of a forum-selection clause on forum non conveniens analysis. 134 S. Ct. at 581-82. We granted the motion and both parties filed supplemental briefs.

The district court had jurisdiction over this action because the Government of Belize is a foreign state. See 28 U.S.C. § 1330. We have appellate jurisdiction because dismissal came in a final order. See 28 U.S.C. § 1291.

II.

We review the district court's forum non conveniens dismissal for abuse of discretion. Aldana v. Del Monte Fresh Produce N.A., 578 F.3d 1283, 1288 (11th Cir. 2009). Therefore, we will "affirm unless we find that the district court has

7

made a clear error of judgment, or has applied the wrong legal standard." Id. (quoting United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004)).  Based on controlling Supreme Court case law decided after the district court issued its dismissal order, we conclude that the district court erred because it conducted its forum non conveniens analysis without first considering the application of the forum-selection clause found in the Master Lease Agreement.  See Atl. Marine, 134 S. Ct. 568.

To obtain dismissal for forum non conveniens, "[t]he moving party must demonstrate that (1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice."  Leon v. Millon Air, Inc., 251 F.3d 1305, 1310-11 (11th Cir. 2001).  Just last year, the Supreme Court in Atlantic Marine explained that an enforceable forum-selection clause carries near-determinative weight in this analysis:

> When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation. A court accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum. . . .
>
> As a consequence, a district court may consider arguments about public-interest factors only.  Because those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases.

134 S. Ct. at 582 (emphasis added).  Thus, a district court now must consider an enforceable forum-selection clause in the forum non conveniens analysis.  A binding forum-selection clause requires the court to find that the forum non conveniens private factors entirely favor the selected forum.

This approach is consonant with the Supreme Court's longstanding recognition "that privately bargained-for forum-selection clauses [are] a necessary component of the expanded international commercial relationships of our time." Estate of Myhra v. Royal Caribbean Cruises, Ltd., 695 F.3d 1233, 1240 (11th Cir. 2012); see Scherk v. Alberto-Culver Co., 417 U.S. 506, 516 (1974) ("A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is, therefore, an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction."); The Bremen v. Zapata Off-shore Co., 407 U.S. 1, 12-13 (1972) ("There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power, such as that involved here, should be given full effect." (footnote omitted)); see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 631 (1985) ("The Bremen and Scherk establish a strong presumption in favor of enforcement of freely negotiated contractual choice-of-forum provisions.").

9

In this case, the district court dismissed for <u>forum non conveniens</u> without addressing the significance of the forum-selection clause.  In the face of this recent high court ruling, we are obliged to vacate the <u>forum non conveniens</u> dismissal. <u>See</u> <u>Atl. Marine</u>, 134 S. Ct. at 581 ("The calculus changes . . . when the parties' contract contains a valid forum-selection clause . . . ."); <u>La Seguridad v. Transytur Line</u>, 707 F.2d 1304, 1308 (11th Cir. 1983) ("[T]he court abuses its discretion when it fails to balance the relevant factors.").  We remand to allow the district court to determine in the first instance whether the forum-selection clause in the Master Lease Agreement is enforceable.  If the forum-selection clause binds the Government, the district court must find that the <u>forum non conveniens</u> private factors unequivocally support the selected forum.  <u>See</u> <u>Atl. Marine</u>, 134 S. Ct. at 582.  The <u>forum non conveniens</u> analysis should then proceed, with the understanding that "[i]n all but the most unusual cases . . . 'the interest of justice' is served by holding parties to their bargain."  <u>Id.</u> at 583.

The Government argues nevertheless that the district court need not have considered the forum-selection clause, for two reasons.  First, the Government claims that the provision is "permissive," not "mandatory."  <u>See</u> <u>Global Satellite Commc'n Co. v. Starmill U.K., Ltd.</u>, 378 F.3d 1269, 1272 (11th Cir. 2004).  "A permissive clause authorizes jurisdiction in a designated forum but does not prohibit litigation elsewhere."  <u>Id.</u>  A mandatory clause, by contrast, "dictates an

exclusive forum for litigation under the contract." Id. (quoting Snapper, Inc. v. Redan, 171 F.3d 1249, 1262 n.24 (11th Cir. 1999)). The Government points to one sentence from the forum-selection clause in which "Lessee specifically acknowledges that Miami-Dade County, Florida is a proper venue for the Lessor to bring suit against Lessee pursuant to the Master Lease or any Lease Schedule." But the lease also provides that the "Lessee irrevocably submits to the exclusive jurisdiction of any of the federal and state courts in the State of Florida in any action or proceeding arising out of or relating to the Master Lease . . . ." (emphasis added). Second, the Government argues that the court need not have looked to the forum-selection clause because the Government overcame the presumption of validity. See The Bremen, 407 U.S. at 15. The Government claims it made a sufficient showing before the district court that the clause was unenforceable as either "unreasonable and unjust" or invalid due to "fraud or overreaching." Id.

The problem is that both arguments require the interpretation and analysis of the Master Lease Agreement. We are reluctant to address them until the district court has had an opportunity to consider them first. On remand, the district court should determine whether the Master Lease Agreement contains a mandatory forum-selection clause that binds the Government.

III.

We also review the district court's decision to dismiss based on international comity for abuse of discretion. Belize Telecom, 528 F.3d at 1303. International comity is an abstention doctrine that reflects "the extent to which the law of one nation, as put in force within its territory, whether by executive order, by legislative act, or by judicial decree, shall be allowed to operate within the dominion of another nation." Hilton v. Guyot, 159 U.S. 113, 163 (1895). "International comity serves as a guide to federal courts where 'the issues to be resolved are entangled in international relations.'" Ungaro-Benages, 379 F.3d at 1237 (quoting In re Maxwell Commc'n Corp., 93 F.3d 1036, 1047 (2d Cir. 1996)). The doctrine of comity "is not a rule of law, but one of practice, convenience, and expediency." Somportex Ltd. v. Phila. Chewing Gum Corp., 453 F.2d 435, 440 (3d Cir. 1971). "Although more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation. Rather, it is a nation's expression of understanding which demonstrates due regard both to international duty and convenience and to the rights of persons protected by its own laws." Id.

Most frequently, international comity is applied retrospectively, when courts consider whether to respect the judgment of a foreign tribunal or to defer to parallel foreign proceedings. See Ungaro-Benages, 379 F.3d at 1238. For retrospective international comity, courts consider whether the foreign court was

competent, whether the foreign judgment was fraudulent, and whether that judgment violated American public policy notions of decency and justice. Id.

Far more rarely, courts have applied international comity prospectively, without a conflicting past or present foreign proceeding. See id. In such cases, "domestic courts consider whether to dismiss or stay a domestic action based on the interests of our government, the foreign government and the international community in resolving the dispute in a foreign forum." Id. "Applied prospectively, federal courts evaluate several factors," namely, (1) "the strength of the United States' interest in using a foreign forum," (2) "the strength of the foreign governments' interests," and (3) "the adequacy of the alternative forum." Id.

Only once has this Court ever sustained the dismissal of a lawsuit based on a prospective application of international comity. In Ungaro-Benages, a plaintiff claimed that two German banks stole her family's ownership interest in a manufacturing company as part of the Nazi program of "Aryanization." Id. at 1229-30. The district court granted summary judgment based in part on the doctrine of international comity, and a panel of this Court affirmed. Id. at 1232. President Clinton had reached an agreement with the German government to achieve a "legal peace" by establishing a private foundation -- funded by voluntary contributions from the German government and German companies -- to hear

13

claims brought by victims of the Nazi regime. Id. at 1231. This Court "decide[d] to abstain based on the strength of our government's interests in using the Foundation, the strength of the German government's interests, and the adequacy of the Foundation as an alternative forum." Id. at 1239. We noted that "the President has the constitutional authority to settle the international claims of American citizens, even if the claimants would prefer litigation in American courts," id., and "that American and German governments have entered into extensive negotiations over this subject and those negotiations affect thousands of other victims of the Nazi regime," id. at 1240.

To support its application of prospective international comity, this Court in Ungaro-Benages cited only three cases, all from the Second Circuit. In two, the Second Circuit ultimately refused to abstain. See Jota v. Texaco, Inc., 157 F.3d 153 (2d Cir. 1998) (considering whether to dismiss proceedings related to environmental damage in Ecuador based on Ecuador's interest in foreign or domestic resolution and holding dismissal on grounds of forum non conveniens and comity erroneous); Pravin Banker Assocs. v. Banco Popular Del Peru, 109 F.3d 850 (2d Cir. 1997) (affirming district court's refusal to stay an action brought by an American holder of Peruvian debt while Peru attempted to renegotiate its commercial debt under the Brady Plan). Thus, Ungaro-Benages relied on only one case that actually dismissed domestic claims to allow foreign proceedings. See Bi

14

v. Union Carbide Chems. & Plastics Co., 984 F.2d 582 (2d Cir. 1993).  In Bi, the

Second Circuit applied the "act of state doctrine" when India created an

adjudication mechanism that granted exclusive government standing to represent

the victims of a mass tort, the Bhopal disaster.  Id. at 586.  The Bi court concluded:

> We hold that when a recognized democracy determines that the
> interests of the victims of a mass tort that occurred within its borders
> will be best served if the foreign government exclusively represents
> the victims in courts around the world, we will not pass judgment on
> that determination, and we will permit only the foreign government
> access to our courts to litigate those claims, subject of course to our
> own requirements for standing.

Id.

In this case, we think the district court abused its discretion in its application

of the three Ungaro-Benages factors that bear on prospective international comity.

Notably, in Ungaro-Benages, all three factors favored dismissal.  First, "[t]he

United States government ha[d] consistently supported the Foundation as the

exclusive forum" after the "President entered into negotiations with the German

government and determined that the interests of American citizens, on the whole,

would be best served by establishing the Foundation Agreement" because it

"creat[ed] a comprehensive compensatory scheme."  Id. at 1239.  Second, "the

German government ha[d] a significant interest in having the Foundation be the

exclusive forum for these claims in its efforts to achieve lasting legal peace with

15

the international community." Id.  Third, the Foundation was an adequate forum.
Id.

Unlike in Ungaro-Benages, here the United States does not have a significant interest in the foreign adjudication of this matter.  The district court recognized that "the United States does have a general interest in seeing that a party's contractual obligations are honored."  We agree.  In this case, "the United States has a strong interest in ensuring the enforceability of valid debts under the principles of contract law, and in particular, the continuing enforceability of foreign debts owed to United States lenders."  Pravin Banker Assocs., 109 F.3d at 855; see Allied Bank Int'l v. Banco Credito Agricola de Cartago, 757 F.2d 516, 521-22 (2d Cir. 1985) ("The United States has an interest in ensuring that creditors entitled to payment in the United States in United States dollars under contracts subject to the jurisdiction of United States courts may assume that, except under the most extraordinary circumstances, their rights will be determined in accordance with recognized principles of contract law."). The Master Lease Agreement was negotiated and signed in the United States.  Intelco completed its performance by presenting the telephone equipment for acceptance in Florida.  GDG, one of the parties to the litigation, is an American entity.  Litigation in a federal forum advances the United States' interest in enforcing agreements formed and performed on American soil in disputes involving an American party.  Tellingly, in

16

Ungaro-Benages the United States submitted a Statement of Interest that represented that it was "in the foreign policy interests of the United States for the case to be dismissed."   379 F.3d 1232.  No statement of foreign policy interest from the United States appears in the current record, and we can discern no such interest favoring the foreign adjudication of this matter.  Thus, the first Ungaro-Benages factor weighs against dismissal.

As for the second factor, the district court abused its discretion in determining that the Government of Belize possesses a strong interest in litigation abroad, strong enough to outweigh the interest of the United States.  To the contrary, the Government of Belize lacks a sufficiently strong interest in foreign adjudication.  This dispute resembles so many other garden-variety commercial contract actions: GDG sues for breach of an equipment lease contract, but the Government claims it is not bound by the agreement.  The record contains no indication that Belize has established an exclusive method of adjudicating this type of contract dispute that would be undermined by prosecution in federal court.  In Ungaro-Benages, an American suit would have undermined the German Foundation's uniform system for paying Nazi-era claims to thousands of victims. 379 F.3d at 1239-40.  In Bi, a federal court action would have conflicted with exclusive Indian government standing to litigate liability for the Bhopal disaster. 984 F.2d at 586.  In other words, Germany and India had powerful and easily

17

discernible interests in protecting their dispute-resolution systems involving thousands of claimants from the corrosion or collapse that would occur if the claims were handled by federal courts. Here, in sharp contrast, GDG's suit does not affect a collective solution to widespread harms. Its federal claims conflict with no foreign system or proceedings.

As a litigant, the Government of Belize now may prefer to handle this suit in its own courts. But a foreign sovereign party's post hoc preference to defend a contract action at home is not a cognizable prospective international comity interest. Prospective international comity requires a serious problem that would be created by federal court proceedings but that would not be present if the matter were adjudicated abroad. Here, we can see no such problem. The parties dispute only the performance under a contract, and the United States is an adequate forum. The Government's invocation of contract cases involving the retroactive application of international comity says little about whether courts should extend prospective international comity to this commercial contract dispute. Though a Belizean forum may be altogether adequate, adequacy is not enough. Ultimately, prospective international comity does not apply because neither the United States nor Belize has the requisite interest.

As we view it, the district court erred when it reached the opposite conclusion based on Belize Telecom. 528 F.3d 1298. A materially different set of

18

facts in that case led us to find it "clear that the interests of Belize far outweigh[ed] the American interests." Id. at 1307. The Belize Telecom dispute arose when the Government of Belize took control of shares of Belize Telecommunications Limited, "the primary provider of telecommunications in Belize." Id. at 1300. The litigants disputed whether the Government acted in accordance with that company's articles of association, as interpreted according to Belize law, when it removed the company's directors and elected a new slate. Crucially, Belize Telecom involved a retrospective international comity dismissal, which entails a wholly different test and different analysis than in prospective cases. See Ungaro-Benages, 379 F.3d at 1238. While the Court's opinion mentioned foreign and domestic interests, Belize Telecom did not weigh them in the context of the Ungaro-Benages prospective framework.

Moreover, none of the three foreign interests cited in Belize Telecom apply here. First, in Belize Telecom "[n]one of the parties to the litigation [wa]s an American corporation," and the lawsuit was only "tangentially" connected to the United States because it involved payments due to an American bank. 528 F.3d at 1307. Here, GDG is an American corporation. And the contract in dispute was negotiated, signed, and performed in the United States.

Second, the action in Belize Telecom threatened to affect the mass "delivery of telecommunications services" to the citizens of Belize. Id. Not so here, where

19

the record contains no indication that the case will have any impact on the provision of Belizean telecommunications services. Moreover, we are not inclined to give weight to another nation's interest merely because of the use of a product purchased in the United States. If foreign purchasers could avoid contract actions in American courts by simply citing the use of goods abroad, international comity abstention would lose its moorings. American merchants rely on the availability of United States courts when dealing with foreign nations in international commerce. Such commerce could be constricted if a merchant knew that an expansive prospective international comity doctrine would allow a foreign government counterparty to remove any suits to its own courts. This result would harm foreign governments, who could have greater difficulty obtaining favorable terms in American transactions. While the Government may now have an ex post interest in litigation in Belize, it may have had an ex ante interest in a federal forum.

Third, Belize Telecom "involve[d] the interpretation of the articles of association of a Belizean corporation pursuant to Belize law." Id. at 1307. In this case, American law applies. The contract unambiguously provided that rights and obligations related to the lease "shall be determined exclusively in accordance with the governing laws of the State of Florida, irrespective of conflicts of laws principles." It may be true that adjudication in federal court could require some application of Belizean law in determining whether Fonseca acted with the

20

authority to bind the Government to the Master Lease Agreement.  But federal courts regularly interpret and apply foreign law without offending international interests.  See Fed. R. Civ. P. 44.1.  And the bulk of the law to be applied to the interpretation of the contract in this case plainly is American.  In short, we think the district court abused its discretion in determining that Belize's preference for "seeing that its national laws are properly interpreted" is the type of strong interest that warrants prospective international comity dismissal.

To date, we have reserved prospective international comity abstention for rare (indeed often calamitous) cases in which powerful diplomatic interests of the United States and foreign sovereigns aligned in supporting dismissal.  We decline to transform prospective international comity into a forum-selection tool for sovereign litigants to wield in common breach of contract actions.   Because neither the United States nor Belize has a strong interest in adjudication of this matter abroad, the district court erred in applying international comity prospectively.

## IV.

The district court erred in dismissing on each alternative ground.  We vacate the forum non conveniens dismissal and remand to the district court so that it may determine the enforceability of the forum-selection clause and its significance to the forum non conveniens analysis.  We also vacate its dismissal based on

21

prospective international comity because that exceptional doctrine does not apply to the commercial dispute in this case.

**VACATED** and **REMANDED**.