[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-12397

_____

D.C. Docket No. 1:12-cv-20558-WJZ

GDG ACQUISITIONS LLC,

Plaintiff - Appellee,

versus

GOVERNMENT OF BELIZE,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 28, 2017)

Before MARCUS, ANDERSON, and GINSBURG,[*] Circuit Judges.

---

[*] Honorable Douglas H. Ginsburg, United States Circuit Judge for the District of Columbia Circuit, sitting by designation.

MARCUS, Circuit Judge:

This is the second time a contract dispute arising out of the lease of telecommunications equipment by the plaintiff GDG Acquisitions, LLC ("GDG"), to the defendant Government of Belize ("Government"), has reached our Court. In Round One, the district court dismissed GDG's complaint on the grounds of forum non conveniens and international comity; we vacated and remanded for the district court to consider the enforceability of the contract's forum-selection clause and its significance to the forum non conveniens analysis. Now, in Round Two, the Government appeals the district court's subsequent denial of its motion to dismiss.

After thorough review, we conclude that the Government waived its sovereign immunity. The Government of Belize claims that the express waiver of sovereign immunity contained in the contract was ineffectual because its Minister of Budget Management, who negotiated and signed the contract on its behalf, lacked the authority to waive sovereign immunity. But despite the Minister's claimed lack of authority to bind Belize, the Government ratified Fonseca's actions by fully performing its contract obligations during the lease term and paying approximately $13.5 million in forty separate payments over a period of nearly six years and spanning two different administrations. This conduct can be explained only on the understanding that the Government intended to be bound to the

2

contract.  Accordingly, we affirm the district court's denial of the Government's motion to dismiss.

## I.

## A.

On February 10, 2012, GDG sued the Government of Belize in the United States District Court for the Southern District of Florida, seeking some $10 million in unpaid rent, with the amount growing each month.  The complaint and the declarations submitted to the district court alleged these basic facts.  As Minister of Budget Management, Investment, and Home Affairs,[1] one of Ralph Fonseca's tasks was to maximize the Government's return on its expenditures of tax revenue funds.  To do so, Fonseca entered into complex negotiations with a Belizean company, International Telecommunications, Ltd. ("Intelco"), in order to reduce the Government's expenditures for telecommunications equipment and services.  Intelco was owned and operated by Glenn D. Godfrey, a former Attorney General of Belize.  Fonseca and Godfrey met several times in Miami to negotiate a lease of telecommunications equipment from Intelco to the Government.  They ultimately closed a deal in Miami on December 18, 2002.  The deal was governed by a Master Lease Agreement (MLA), which was negotiated in Miami and signed in

---

[1] This title was later changed to Minister of Finance and Home Affairs.

Washington, D.C., by Godfrey on behalf of Intelco and by Fonseca purportedly on behalf of the Government of Belize.

All rents due under the MLA were evidenced by promissory notes delivered by the Government to Intelco; the financing was supported by the International Bank of Miami.  The same day they signed the MLA, the parties signed a first lease schedule and promissory note for $6,748,189.20, to be paid in twenty quarterly payments of $337,409.46 each.  That five-year lease was scheduled to end on December 18, 2007, with the final payment being due on that date.  On August 27, 2003, the parties agreed to a second lease of additional telecommunications equipment pursuant to a second lease schedule and promissory note, also in the amount of $6,748,189.20, again to be paid in twenty quarterly payments of $337,409.46 each.  The second five-year lease was scheduled to end on August 27, 2008; the final payment was due on that date.  After entering into the agreement, Intelco assigned the payments to the International Bank of Miami in exchange for a single upfront cash payment from the bank of $10 million for the two leases.

Three provisions in the MLA are essential to the resolution of this appeal.  First, the Master Lease Agreement contained a provision stating that the Government waived its sovereign immunity:

> Lessee acknowledges that the activities contemplated by this Master Lease and each Lease Schedule are commercial in nature rather than governmental

4

or public, and therefore acknowledges and agrees that it is not entitled to any right of immunity or defense on the grounds of sovereignty or otherwise with respect to any such action or proceeding arising out of or relating to this Master Lease or any Lease Schedule.  Lessee hereby expressly and irrevocably waives any such right of immunity or defense which now or hereafter may exist or claim thereto which may now or hereafter exist in respect of the Master Lease or any Lease Schedule and its obligations arising thereunder, and agrees not to assert any such right or claim in any such action or proceeding, whether in the United States of America or elsewhere. Lessee hereby expressly and irrevocably waives any defense or claim it may have to delay, hinder or stop the enforcement of this Master Lease or any Lease Schedule based directly or indirectly upon the Act of State Doctrine. Neither Lessee nor any of its property enjoys any right of immunity from suit, setoff, judgment, execution on a judgment or attachment prior to judgment or in aid of execution in respect of its obligations under this Master Lease or any Lease Schedule.

Second, the MLA included a forum-selection clause:

Lessee hereby waives any special rights or immunities which it may enjoy under the laws of Belize, and agrees and abides that its rights and obligations under this Master Lease or any Lease Schedule shall be determined exclusively in accordance with the governing laws of the State of Florida, irrespective of conflict of laws principles.  Lessee irrevocably submits to the exclusive jurisdiction of any of the federal and state courts in the State of Florida in any action or proceeding arising out of or relating to the Master Lease or any Lease Schedule, and Lessee hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in any court of competent jurisdiction in the State of Florida.

Finally, the MLA contained a waiver of objections to venue or to claims of an

inconvenient forum:

Lessee hereby irrevocably waives any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to the Master Lease or any Lease Schedule and hereby further irrevocably waives any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Lessee specifically acknowledges that Miami-Dade County, Florida is a

5

proper venue for the Lessor to bring suit against Lessee pursuant to the Master Lease or any Lease Schedule.

Another provision in the MLA governed the termination or expiration of the leases. Early termination of the leases required 120 days' written notice of the Government's intent to return the equipment. The failure to give notice triggered an automatic extension of the applicable lease schedule on a month-to-month basis for a period not to exceed twelve months. At the end of the term, the Government was required to return the equipment to Intelco; if it did not do so, it was obliged to continue making payments in an amount equal to the average monthly rent during the lease term.

The Government of Belize made forty (quarterly) rental payments for the terms of the two leases, totaling nearly $13.5 million. The complaint alleged that Belize never evinced any intent to return the equipment during either the lease terms or the automatic renewal terms, but it continued to possess and use the equipment after the termination of the lease periods. The Government has not made any additional lease payments since 2008.

B.

On January 26, 2012, Godfrey created GDG Acquisitions, LLC, as a Florida limited liability company; its principal place of business was in Houston, Texas. Shortly thereafter, Intelco assigned all of its assets to GDG, including its interest in the Belize agreements. Soon after GDG's complaint had been filed, the

6

Government moved to dismiss, offering three reasons: the lack of subject matter jurisdiction because of foreign sovereign immunity; forum non conveniens; and international comity. On March 28, 2013, the district court granted the Government's motion citing forum non conveniens and international comity; it did not address the defense of foreign sovereign immunity.

On April 22, 2014, a panel of this Court vacated the dismissal and remanded the case. GDG Acquisitions, LLC v. Gov't of Belize, 749 F.3d 1024 (11th Cir. 2014). We vacated the forum non conveniens determination in light of the Supreme Court's decision in Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for the W. Dist. of Tex., 134 S. Ct. 568 (2013), which instructed the district court to give "controlling weight" to a valid forum-selection clause when conducting a forum non conveniens analysis "in all but the most exceptional cases." Id. at 581 (quotation omitted). Because "[a] binding forum-selection clause requires the court to find that the forum non conveniens private factors entirely favor the selected forum," GDG Acquisitions, 749 F.3d at 1029, the panel remanded the case to the district court with instructions to "determine the enforceability of the forum-selection clause and its significance to the forum non conveniens analysis." Id. at 1034. The panel also vacated the district court's dismissal because of international comity, concluding that retrospective international comity did not apply without a

7

judgment from a foreign court and that this case did not fall within the narrow sphere of prospective international comity.  Id.

On remand, after supplemental briefing and argument, the district court denied the Government's motion to dismiss.  The court determined that it first had to decide whether the forum-selection clause was binding and enforceable.  This in turn required answering whether Fonseca had the authority to waive the Government's sovereign immunity.  As the district court framed the question: "If Minister Fonseca possessed the requisite authority to bind the Government of Belize, then both the sovereign immunity waiver and the forum selection clause are likely valid and enforceable.  If he did not possess said authority, then they are not."

To answer that question, the trial court turned to this Court's precedent in Aquamar S.A. v. Del Monte Fresh Produce N.A., Inc., 179 F.3d 1279 (11th Cir. 1999), which had held that courts should start with the assumption "that an ambassador possesses the authority to appear before them and waive sovereign immunity absent compelling evidence making it 'obvious' that he or she does not." Id. at 1299.  Over the Government's objection, the district court applied this presumption to Minister Fonseca and, relying on declarations filed by both parties, concluded that "the Government of Belize ha[d] not met its burden and shown by a preponderance of the evidence that the FSIA's waiver exception [did] not apply."

8

No extraordinary circumstances were found and no compelling evidence existed in the record suggesting that Fonseca lacked the authority to waive the Government's sovereign immunity. Thus, the district court held that the waiver exception was satisfied and that Belize could be sued in a United States court. Turning to the forum-selection clause, the district court concluded that the clause was enforceable because Fonseca had the authority to bind the Government. The court observed that, after Atlantic Marine, it was compelled to find that the private factors of the forum non conveniens analysis favored adjudication in the preselected forum, and, therefore, it denied the Government's motion to dismiss.

The Government now appeals from that decision.

## II.

"It is well-settled that a court of appeals has jurisdiction over interlocutory orders denying claims of immunity under the FSIA." Butler v. Sukhoi Co., 579 F.3d 1307, 1311 (11th Cir. 2009). We review de novo a district court's determination of jurisdiction under the Foreign Sovereign Immunities Act of 1976 (FSIA), Pub. L. No. 94-583, 90 Stat. 2891, codified as amended in various sections of Title 28. Aquamar, 179 F.3d at 1289. "We may set aside the district court's factual determinations, however, only if they are clearly erroneous." Id. at 1290. "To determine whether subject-matter jurisdiction under the FSIA exists, a court looks at the plaintiff's allegations and any undisputed facts that the parties have put

9

forward."  Architectural Ingenieria Siglo XXI, LLC v. Dominican Republic, 788 F.3d 1329, 1338 (11th Cir. 2015).

Like the district court, we are a court of limited jurisdiction; our power to act "is determined by Congress 'in the exact degrees and character which to Congress may seem proper for the public good.'"  Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 433 (1989) (quoting Cary v. Curtis, 44 U.S. (3 How.) 236, 245 (1845)).  Through the FSIA, Congress has given the district courts original jurisdiction over "any nonjury civil action against a foreign state . . . as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity."  28 U.S.C. § 1330(a).  Indeed, "Congress[ ] inten[ded] that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts."  Amerada Hess Shipping, 488 U.S. at 434; see also Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 610 (1992) ("The [FSIA] establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state.").

Under the FSIA, it is also well established that "a foreign state is presumptively immune from the jurisdiction of United States courts."  Saudi Arabia v. Nelson, 507 U.S. 349, 355 (1993).  To overcome the presumption, the plaintiff must "produc[e] evidence that 'the conduct which forms the basis of [the] complaint falls within one of the statutorily defined exceptions.'"  Butler, 579 F.3d

10

at 1312–13 (quoting S & Davis Int'l, Inc. v. Republic of Yemen, 218 F.3d 1292,

1300 (11th Cir. 2000)).  "Whether the plaintiff has satisfied his burden of

production in this regard is determined by looking at 'the allegations in the

complaint [and] the undisputed facts, if any, placed before the court by the

parties.'" Id. at 1313 (quoting In re Terrorist Attacks on Sept. 11, 2001, 538 F.3d

71, 80 (2d Cir. 2008)) (alteration in original).  If the plaintiff "has asserted facts

suggesting that an exception to foreign sovereign immunity exists, the party

arguing for immunity . . . bears the burden of proving by a preponderance of the

evidence that the exception does not apply."  Aquamar, 179 F.3d at 1290.

In this case, therefore, the burden of production rested with GDG to

establish that an exception to the FSIA existed.  GDG satisfied its burden by

asserting facts in its complaint suggesting that the waiver exception to the FSIA

applied because the Government had waived sovereign immunity in the Master

Lease Agreement.  The statute's waiver exception says that:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the
> United States or of the States in any case --
>
>> (1) in which the foreign state has waived its immunity either explicitly
>> or by implication, notwithstanding any withdrawal of the waiver
>> which the foreign state may purport to effect except in accordance
>> with the terms of the waiver.

28 U.S.C. § 1605(a)(1).  "[A]s a general rule, explicit waivers of sovereign

immunity are narrowly construed in favor of the sovereign and are not enlarged

11

beyond what the language requires." Architectural Ingenieria, 788 F.3d at 1338 (quotations omitted).[2]

After GDG asserted facts establishing that an exception applied, the burden of going forward shifted to the Government of Belize to show, by a preponderance of the evidence, that the waiver exception did not apply. See Aquamar, 179 F.3d at 1290. The Government has not carried its burden because this record overwhelmingly demonstrates that it ratified the Master Lease Agreement and the waiver of sovereign immunity.

## A.

In determining whether there was a waiver, the district court applied the Aquamar presumption that ambassadors have the authority to waive sovereign immunity absent compelling evidence to the contrary. The court found "no evidence in the record that makes it 'obvious' that Minister Fonseca lacked the authority to waive Belize's sovereign immunity." Thus, it concluded that "the Government of Belize authorized the sovereign immunity waiver contained within the Master Lease Agreement." On appeal, both parties explicate Aquamar at considerable length. The Government claims that Aquamar applies only to cases involving ambassadors and that, if applied to cases involving governmental

---

[2] The original complaint also alleged that the commercial-activity exception, found in 28 U.S.C. § 1605(a)(2), applied to this case, but the district court never addressed that issue and neither party argued it here. Thus, only the waiver exception is before us.

ministers other than ambassadors, it should require, at a minimum, a showing of actual authority as prescribed by the foreign state's laws. GDG responds that Aquamar contains the correct standard and that the presumption of authority to waive immunity was properly applied.

We think the presumption created by the Court in Aquamar is inapplicable in this case. Aquamar addressed an ambassador's authority to waive sovereign immunity in pending litigation. See Aquamar, 179 F.3d at 1293. Based on Congress's "indicat[ion] that courts should look to international law when interpreting the FSIA's terms," the panel examined various sources of customary international law and concluded that "a sovereign's chief diplomatic representative to a foreign nation possesses an extraordinary role and powers." Id. at 1294–95. This conclusion was bolstered because "[i]nternational courts traditionally have assumed that an ambassador's powers include the authority to present his or her country's position before foreign tribunals." Id. at 1296. The panel also noted that many federal courts acknowledge the presumption. See id. at 1297 (citing cases). Thus, the Court held that, "under the FSIA, courts should assume that an ambassador possesses the authority to appear before them and waive sovereign immunity absent compelling evidence making it 'obvious' that he or she does not." Id. at 1299.

13

Aquamar cannot provide the answer because this case does not involve the acts of an ambassador. In Aquamar, we emphasized the unique qualities and powers of an ambassador. An ambassador "performs several important functions on behalf of the state" he represents, including "'representing the sending State in the receiving State[,] protecting in the receiving State the interests of the sending State and of its nationals, within the limits permitted by international law,' and 'act[ing] as representative of the sending State to any international organization.'" Id. at 1295–96 (quoting Vienna Convention on Diplomatic Relations, arts. 3, 5(3), Apr. 18, 1961, 23 U.S.T. 3227, 500 U.N.T.S. 95) (citation omitted). But the province and function of an ambassador is profoundly different from the powers and responsibilities normally associated with a budget minister. Customary norms of international law do not as a general rule recognize a Minister of Budget Management as having such "broad powers to bind the countr[y] [he or she] represent[s]" or as being able to "speak for his or her country." Id. at 1296–97. Thus, we have no occasion to apply the Aquamar presumption.

## B.

"Just as federal courts apply a federal standard to determinations of the scope of an express waiver, and of the existence of an implied waiver, we apply federal law to the question of whether a waiver has been effected by one with the

14

authority to do so." Id. at 1294 (citations omitted).[3]  The FSIA does not specify

what kind of authority -- actual or apparent -- is required to waive sovereign

immunity.  We need not answer that question because both parties agree that actual

authority is the proper standard against which to measure the conduct of the

Government of Belize and its ministers.

Whether Fonseca had the authority to act on behalf of the Government is a

question of agency.  In an agency relationship, "[t]he 'principal' is '[t]he one for

whom action is to be taken,' and the 'agent' is '[t]he one who is to act.'"  United

States v. Schaltenbrand, 930 F.2d 1554, 1560 (11th Cir. 1991) (quoting

Restatement (Second) of Agency § 1(2)–(3)) (citation omitted).  In this case, the

parties characterize Fonseca as the agent acting for the sovereign as the principal.

The record establishes that Fonseca signed the MLA, the promissory notes, and the

lease schedules on behalf of the Government of Belize.  Those documents say that

the agreement, notes, and lease schedules were entered into by "the Government of

---

[3] We offer no view on the wisdom or efficacy of using foreign law to illuminate the meaning of waiver because we need not use foreign law to arrive at an answer in this case.  While Aquamar warns of the dangers of using foreign law, it does so only in dicta.  See Aquamar, 179 F.3d at 1297–98.  Indeed, none of the three out-of-circuit cases cited by the Government of Belize in support of foreign law requires the use of foreign law in making the authority determination.  In Velasco v. Gov't of Indonesia, 370 F.3d 392, 400–02 (4th Cir. 2004), the Fourth Circuit looked to declarations and governmental decrees filed in the district court but nowhere said that it was required to look to foreign law.  In both Dale v. Colagiovanni, 443 F.3d 425, 429–30 (5th Cir. 2006), and Phaneuf v. Republic of Indonesia, 106 F.3d 302, 308 (9th Cir. 1997), the courts remanded the cases for an authority analysis without mentioning the use of foreign law.  However, in a second, unpublished decision, the Ninth Circuit did analyze foreign law but again did not say that it was required to do so.  See Phaneuf v. Gov't of Indonesia, 18 F. App'x 648, 650–51 (9th Cir. 2001).

Belize, through the Ministry of Budget Management" and, after a change in title, by "the Government of Belize, through the Ministry of Finance and Home Affairs."

We have already held that "[w]hen applying agency principles to federal statutes, 'the Restatement [ ] of Agency . . . is a useful beginning point for a discussion of general agency principles.'" Arriaga v. Fla. Pac. Farms, LLC, 305 F.3d 1228, 1245 (11th Cir. 2002) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 755 (1998)). According to the Restatement (Third) of Agency, "[a]n agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01 (2006).

In this case, however, we need not decide whether Fonseca had actual authority to enter into the MLA because the Government subsequently ratified his actions and, therefore, agreed to be bound by them as if they were done with actual authority. While "[o]nly interactions that are within the scope of an agency relationship affect the principal's legal position," id. at § 1.01 cmt. c, the principal may also ratify his agent's unauthorized actions, thus becoming bound by their legal consequences. See id. at § 4.01 & cmt. b. In this way, the principal

16

subsequently places its imprimatur on the agent's unauthorized acts, converting them into the acts of the principal.

The Restatement defines "ratification" as "the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Id. at § 4.01(1).  Generally, "[a] person may ratify an act if the actor acted or purported to act as an agent on the person's behalf," id. at § 4.03 -- that is, if the ratifier was the principal for whom the agent acted or purported to act.  The ratifier thus must have existed at the time of the act and must have had the capacity to have legal relations and to act as a principal at the time of ratification.  See id. at §§ 4.01(3)(b), 4.04(1) & cmt. b.  If the principal subsequently ratifies his agent's act, "the legal consequence is that the [principal's] legal relations are affected as they would have been had the actor been an agent acting with actual authority at the time of the act."  Id. at § 4.01 cmt. b; see also id. ("A principal's ratification confirms or validates an agent's right to have acted as the agent did."); id. at § 4.02(1) ("[R]atification retroactively creates the effects of actual authority.").  Thus, if Fonseca's acts were ratified by the Government, then his actions are given effect as if he had acted with actual authority.

Under the Restatement, "[a] person ratifies an act by (a) manifesting assent that the act shall affect the person's legal relations, or (b) conduct that justifies a reasonable assumption that the person so consents."  Id. at § 4.01.  For example, a

17

"person may ratify [an] act through conduct justifiable only on the assumption that the person consents to be bound by the act's legal consequences." Id. at § 4.01 cmt. d. That is, if the principal engages in conduct that could be explained only by the principal's agreement to be bound by the agent's act, then the principal has ratified that act.

The undisputed and unambiguous facts found in the record indicate that the Government made forty payments of $337,409.46 each in accordance with the lease schedules for the entirety of the two concurrent five-year leases, which collectively spanned five years and eight months (from December 18, 2002, to August 27, 2008) and amounted to the sum of approximately $13.5 million. The payments continued even after a change of administration in the Government of Belize in February 2008. The Government's conduct in making the payments as required by the MLA, the promissory notes, and the lease schedules can be understood only on the assumption that the Government repeatedly consented to be bound by the MLA -- indeed, it is difficult to conceive of any other reason why the Government would have willingly made regular payments totaling nearly $13.5 million.

The Government does not deny that it made these payments. Throughout the district court proceedings, the Government and its declarants acknowledged that "[p]ayments were made to the International Bank of Miami," that the

18

Government's obligations to the International Bank of Miami as required by the promissory notes were "fully paid," that "it is undisputed that the bank has been paid off already," and that "payments were made by [the Government] to the International Bank of Miami for services provided by Intelco." Those concessions were repeated in the Government's opening brief on appeal, in which the Government acknowledged that the "amounts were paid through the end of the term in each Lease Schedule, totaling $6,748,189.20 under each." And the fact of the payments was again acknowledged during oral argument:

> Court: Did the Government of Belize appropriate the money each year to make payments to satisfy the terms of the MLA and were not the funds made by the Government? You can tell me yes, but it doesn't matter, but I want to know an answer to that question.
> Government of Belize: The answer is yes.

As the record conclusively establishes, the payments were made.

Proof of payment was entered into the record in the form of four payment warrants filed as exhibits to GDG's response to the Government's motion to dismiss. These payment warrants were on official Ministry of Finance letterhead and were sent from Hugh McSweaney, Financial Secretary, to Sydney Campbell, Governor of the Central Bank of Belize. Three of the sample payment warrants noted that "the Government of Belize agreed to pay all Rent Payments under the lease to Intelco's account at the International Bank of Miami," and all of the warrants specified that they were for rent payments due to Intelco.

19

Still another form of conduct that may yield consent by ratification inheres in the retention of benefits generated by the agent's act. See Restatement (Third) of Agency at § 4.01 cmt. g ("A person may ratify an act under subsection (2)(b) by receiving or retaining benefits it generates if the person has knowledge of material facts and no independent claim to the benefit.") (citation omitted). Thus, a principal's retention of benefits realized as a result of his agent's unauthorized actions likewise suggests that although the agent might initially have acted without authority, the principal has approved the act and wishes to be bound by it. In this case, again, it is undisputed that the Government retained the telecommunications equipment for the duration of the two leases and, indeed, that the Government still has not returned the equipment to GDG. The Government retained its benefits under the MLA and, in doing so, consented to be bound to the legal consequences of the agreement. Again, neither the act of retaining the telecommunications equipment for nearly six years nor the act of making payments can be understood absent the assumption that the Government intended to be bound by the agreement. On this record, then, there is no need to inquire into Belizean law. Quite simply, the Government of Belize consented to and affirmed Fonseca's actions by ratification; the explicit waiver of sovereign immunity contained within the Master Lease Agreement is, therefore, binding and enforceable.

20

C.

The Government of Belize nevertheless says that ratification fell short in this case. Belize argues that "an agreement that is void ab initio cannot be enforced against a sovereign under a 'ratification' theory" because subsequent payments cannot create actual authority that did not exist at the time of the actions. This argument misapprehends the nature of ratification. As we have noted, the doctrine of ratification starts with the assumption that the agent did not have actual authority at the time he acted. See McDonald v. Hamilton Elec., Inc. of Fla., 666 F.2d 509, 514 (11th Cir. 1982) ("A principal can ratify the unauthorized act of an agent purportedly done on behalf of the principal either expressly or by implication through conduct that is inconsistent with an intention to repudiate the unauthorized act.") (emphasis added). It is precisely on account of the principal's subsequent consent that the prior unauthorized act "is given effect as if done by an agent acting with actual authority." Restatement (Third) of Agency § 4.01(1). Thus, it is of no moment that Fonseca may have acted without actual authority at the time he entered into the agreement.

Belize also claims that the payments under the MLA ratified only the MLA's payment obligations and not its waiver of sovereign immunity. An application of the Restatement (Third) of Agency again squarely forecloses this argument. Section 4.01(3) of the Restatement says that ratification cannot occur

21

unless "the ratification encompasses the act in its entirety as stated in § 4.07."

Section 4.07 in turn states that "[a] ratification is not effective unless it

encompasses the entirety of an act, contract, or other single transaction."  Id. at

§ 4.07 (emphasis added).  This does not mean that a principal must expressly state

that he is ratifying the entire transaction for ratification to be effective, because

"[a] person may not, by ratifying an act, obtain its economic benefits without

bearing the legal consequences that accompany the act."  Id. at § 4.07 cmt. b.

> Two illustrations inform our handling of this dispute:

> 3. Acting without actual or apparent authority, A purports to sell a yacht owned by P, the "Acis," to T for $100,000.  A then sells a second yacht, the "Galatea," also owned by P, to T for $75,000.  On hearing the facts, P faxes T: "You may keep Acis but Galatea went too cheaply."  P has ratified the sale of Acis but not Galatea.

> 4. Same facts as Illustration 3 except that, as P knows, A purported to sell Acis to T using a written contract form containing an arbitration clause.  P's ratification of A's sale of Acis binds P to the arbitration clause.

Id. at § 4.07 cmt. c, illus. 3–4.  In this case, the Government of Belize made

payments pursuant to and retained the benefits of an agreement that also included a

waiver of sovereign immunity and a forum-selection clause.  The payment

warrants themselves expressly noted that the payments were for rents due under

the lease, indicating that the payments were made with knowledge of the contract.

The Government accepted both the benefits (telecommunications equipment) and

the burdens (payments) of the contract.  The Government's ratification of the

22

payment obligation binds it to the rest of the contract, just as P's acceptance of $100,000 for Acis also bound him to the arbitration clause in the example cited above.

Finally, the Government tries to avoid the consequences of the Master Lease Agreement by claiming that the payments made under the MLA were unauthorized. As support, the Government relies on a case drawn from the Caribbean Court of Justice (Belize's highest court), BCB Holdings Ltd. v. Attorney General of Belize, [2013] CCJ 5 (AJ). In that case, the Minister of Finance and the Attorney General of Belize apparently had entered into an agreement with two private companies to create an alternative corporate tax regime for those companies that contravened Belizean tax laws. After a change in administration, the Government disavowed the contract. Arbitration resulted in a judgment for the companies, but the Caribbean Court of Justice declined to enforce the award as being against public policy.

The Government's argument fails for at least three reasons. First, as we've already detailed, foreign law does not provide the guiding principles for interpreting American laws. See Aquamar, 179 F.3d at 1294. This case requires us to interpret the waiver exception of the FSIA -- an American statute. In determining whether Fonseca had the authority to waive sovereign immunity, we need only look to the Restatement and to American principles of agency. We need

23

not consult a foreign case in applying American principles of ratification to the Government's conduct.

In the second place, the Government's argument that the payments themselves were unauthorized was raised only for the first time in oral argument and has thus been waived. This Court "will not address a claim that has been abandoned on appeal or one that is being raised for the first time on appeal, without any special conditions." Access Now, Inc. v. Southwest Airlines Co., 385 F.3d 1324, 1335 (11th Cir. 2004). The Government referenced the BCB Holdings case in district court, but in support of three different points: first, that "an agreement entered into by a governmental minister without actual authority is invalid and unenforceable in its entirety -- including any and all provisions contained within the agreement"; second, that "an agreement that is void ab initio cannot be enforced against a foreign sovereign under a 'ratification' theory"; and finally, that the MLA is not enforceable under a theory of unjust enrichment.[4] In district court, the Government never argued that the payments themselves were made without authorization; it cannot assert that argument for the first time here.

---

[4] Moreover, regardless of whether the Caribbean Court of Justice's opinion supports these arguments, they lack merit in this case. Again, ratification starts from the premise that the initial act was done without authorization. See Restatement (Third) of Agency § 4.01 & cmt. b. The principal's acceptance of the benefits and burdens of the contract also binds the principal to the contract's other clauses. See id. at § 4.07 & cmt. g. And finally, GDG has never asserted that the MLA should be enforced under an unjust enrichment theory.

24

Finally, even if we were to consider BCB Holdings, the outcome would not change. BCB Holdings examined a wholly different contract between wholly different parties in a wholly different setting. The opinion employed no discussion of ratification and we can discern no reason to rely on the Caribbean Court of Justice's decision that the enforcement of one arbitration agreement was against public policy to invalidate an entirely different agreement.[5]

The long and short of it is that the Government ratified Fonseca's actions through its repeated payments of large sums of money over many years and by its retention of the telecommunications equipment. It thereby ratified the waiver of sovereign immunity contained in the same agreement.

### III.

The Government of Belize also says that the district court should have dismissed the case for forum non conveniens. Again, we are unpersuaded. We review a district court's forum non conveniens analysis for abuse of discretion. Aldana v. Del Monte Fresh Produce N.A., 578 F.3d 1283, 1288 (11th Cir. 2009). Under that standard, "we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." Id. (quoting United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc)).

---

[5] Moreover, we would have to weigh the Caribbean Court of Justice's decision against an unpublished decision from the D.C. Circuit enforcing that same arbitration agreement in federal court. See BCB Holdings Ltd. v. Gov't of Belize, 650 F. App'x 17, 18 (D.C. Cir. 2016) ("Belize has failed to justify the use of the public policy exception in this case.").

25

To obtain the dismissal of a case for <u>forum non conveniens</u>, the moving party must show that "(1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice." <u>Leon v. Millon Air, Inc.</u>, 251 F.3d 1305, 1311 (11th Cir. 2001).  In considering these factors, the reviewing court "must evaluate both the convenience of the parties and various public-interest considerations," and it must then "decide whether, on balance, a transfer would serve the convenience of the parties and witnesses and otherwise promote the interest of justice." <u>Atlantic Marine</u>, 134 S. Ct. at 581 (quotation omitted).

"The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum." <u>Id.</u> (quotation omitted).  So long as the contract and the clause are binding and enforceable, "a district court should ordinarily transfer the case to the forum specified in that clause." <u>Id.</u>  This is because "[w]hen parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." <u>Id.</u> at 582.  The reviewing court thus "must deem the private-interest factors to weigh entirely in favor of the preselected forum"; the court "should not consider arguments about the parties' private interests." <u>Id.</u>  And

26

"[b]ecause [the public-interest] factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." Id. Thus, dismissal for forum non conveniens would be permissible in this case only if "extraordinary circumstances unrelated to the convenience of the parties" were present. Id. at 581.

The Government does not challenge the merits of the district court's forum non conveniens analysis, nor does it argue that extraordinary circumstances are present to support a forum non conveniens dismissal. It offers only that "[t]he District Court erred in allowing Aquamar to dictate whether Fonseca possessed authority to bind [the Government] to the forum selection clause," and that local law should have been considered in the forum non conveniens analysis. The Government is correct that the Aquamar presumption does not apply but, as we have explained, in this case the district court nevertheless properly concluded that Belize was bound by the MLA. Because Fonseca possessed the actual authority to act through the Government's ratification of the MLA, the forum-selection clause was binding. The district court did not abuse its discretion.

We AFFIRM the denial of the Government's motion to dismiss.

27